In the United States District Court
For the Southern District

———————————————————X

SEAN SALLEY,                              :
      Plaintiff,                     :

                     :      A M E N D E D

     -against-              :     C O M P L A I N T

                     :  D O C K E T   N O.: <u>Salley v.</u>
MICHAEL CAPRA, Superintendent,            :  <u>Capra</u>, 23-CV-4566 (KMK)
COURTNEY NIXON, Captain,
ELANE VELEZ, Deputy of Programs,          :
T. ALAM, Medical Doctor,
CASSANDRA QUICK, Greivance Supervisor,    :     J U R Y  T R I A L
KRISTEN TRAPALIS, NYSDOCCS Classification       D E M A N D E D
       & Movement Analysis,    :
JANE DOE, NYSDOCCS Classification &
    Movement Supervisor,       :

All Defendants' are being sued in         :
their individual and official
capacities.                               :

———————————————————X

## I. COMPLAINT

    Plaintiff SEAN SALLEY, pro se, for his complaint states as follows:

## II. PARTIES, JURISDICTION & VENUE

1.    Plaintiff SEAN SALLEY was confined in Sing Sing Correctional Facility, located at 354 Hunter Streeet, in the City of Ossining in the State of New York from August 3, 2022 to June 2023.

2.    Plaintiff SEAN SALLEY is, and was at all times mentioned herein, an adult citizen of the United States and a resident of the State of New York.

3.    Defendant MICHAEL CAPRA is, and was at all relevant times herein, the Superintendent of Sing Sing Correctional Facility. As superintendent of the prison, defendant manages its day-to-day operations and executes its policies. As superintendent, defendant is the chief member of the facility administration Executive Team,

which meets with the Incarcerated Individual Liaison Committee on a monthly bases to address issues of concern within the facility.

4.    Defendant COURTNEY NIXON is employed as a Captain at Sing Sing Correctional Facility, and was at all relevant times a captain during the allegations described herein. As a Captain, defendant is a member of the facility Executive Team, which meets with the Incarcerated Individual Liaison Committee on a monthly bases to address issues of concern within the facility.

5.    Defendant ELANE VELEZ is, and was at all rlelvant times herein, the Deputy of Programs at Sing Sing Correctional Facility. As Deputy of Programs at Sing Sing, defendant manages its day-to-day operations concerning facility programming. As Deputy of Programs, defendant is a member of the facility Executive Team, which meets with the Incarcerated Individual Liaison Committee on a monthly bases to address issues of concern within the facility.

6.    Defendant T. ALAM is, and was at all times relevant herein, employed as a doctor at Sing Sing Correctional Facility, as was Plaintiff's primary health care provider during the allegations described herein. As a doctor of the prison, defendant is responsible for the examination, treatment, diagnosing, care, and transferring of incarcerated individuals under medical needs.

7.    Defendant CASSANDRA QUICK is, and was at all times relevant herein, the Incarcerated Individual Grievance Program Supervisor at Sing Sing Correctional Facility. As Grievance Supervisor of the prison, defendant oversees all grievances, and manages the day-to-day operations of the grievance program.

8.      Defendant KRISTEN TRAPALIS is, and was at all times relevant herein, employed as a Classification & Movement Analysis at the New York State Department of Correction & Community Supervision, located in Albany, New York. As a Classification & Movement Analysis, defendant is responsible for identifying and documenting all needs for the transferring of incarcerated individuals based upon NYSDOCCS departmental coding.

9.      Defendant JANE DOE, is, and was at all times relevant herein, employed as the Classification & Movement Supervisor at the New York State department of Correction & Community Supervision, located in Albany, New York. As the Classification & Movement Supervisor, defendant is responsible for evaluating the work and documentation of Classification & Movement analysis, and giving the final approval for incarcerated individuals transfers.

10.     This action arises under  and is brought pursuant to 42 U.S.C. Section 1983 to remedy deprivation, under the color of State law, of rights guaranteed by the Fourteenth Amendment to the United States Constitution. This Court has jurisdiction over this action pursuant to 28 U.S.C. Sections 1331 and 1343.

11.     Plaintiff's claims for injunctive relief are authorized by Rule 65 of the Federal Rules of Civil Procedure.

12.     This cause of action arose in the Southern District of New York. Therefore, this venue is proper under 28 U.S.C. Section 1391(b).

13.     Plaintiff has filed no other lawsuits dealing with the same facts involved in this action or otherwise relating to his imprisonment.

III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

14.    On or about July 10, 2022, Plaintiff filed a grievance at Shawangunk Correctional Facility [hereinafter "Shawangunk"] challenging defendants' transfer of him under the false pretenses of "medical need." this grievance was given Griveance Number #0249-22. Plaintiff then filed an additional grievance against defendants' relating to the same matter on July 14, 2022.

15.    Plaintiff's grievance was answered by Shawangunk's grievance office on the date of August 18, 2022, in which Plaintiff appealed to Shawangunk's Superintendent, Mr. T. McGuinness on August 18, 2022.

16.    Plaintiff received the Superintendent's response to his grievance on the date of August 26, 2022, in which Plaintiff then appealed to New York State Department of Corrections & Community Supervision [hereinafter "NYSDOCCS"] Central Office Reviewing Committee [hereinafter "CORC"], located in Albany, New York. As of date of this amended complaint, Plaintiff has yet to receive a final determination and response to his greivance CORC appeal.

## IV. STATEMENT OF CLAIM

17.    At all relevant times herein, defendants' were "persons" for purposes of 42 U.S.C. Section 1983 and acted under the color of law to deprive Plaintiff of his constitutional rights, as set forth more fully below.

## V. STATEMENT OF FACTS

18.    While confined at Great Meadow Correctional Facility [hereinafter "Great Meadow"], Plaintiff was scheduled for an "Area-of-Preference" transfer by his Offender Rehabilitation Counselor

[hereinafter "ORC"] in "2021/" Shortly after the submission of Plaintiff's "Area-of-transfer," legislators enacted Correction Law § 72(c), requiring incarcerated individuals [hereinafter "I/I's"] with minor children, to be placed in correctional facilities within closest proximity to their children. Plaintiff was then scheduled to fill out the paperwork for the "Close Proximity" transfer by his ORC, due to being eligible on account of Plaintiff's two step-children.

19.    In the year of "2022," Plaintiff was awarded a transfer from Great Meadow to Sing Sing Correctional facility [hereinafter "Sing Sing"], in which Plaintiff was placed on the draft at Great Meadow on July 29, 2022, and arrived at Sing Sing on August 3, 2022.

20.    Upon Plaintiff's arrival at Sing Sing, Plaintiff was scheduled to see medical as an initial screening process, and to be assigned a primary health care provider. Which, at this time, Plaintiff was assigned Defendant T. Alam [hereinafter "Defendant Alam"] as his primary health care provider. It was at this time that Defendant Alam reviewed Plaintiff's medical file and determined that no action was needed and Plaintiff was suitable to be housed at Sing Sing.

21.    on or about the date of March 4, 2022, Plaintiff requested sick-call to be given some asprin for the soreness in his back from over-exerting himself working out doing physical exercises. At this time, Plaintiff was seen by Defendant Alam, in which Defendant Alam gave Plaintiff a temporary subscription for Nabumetone. Plaintiff then requested Defendant Alam for a temporary "flat pass," in which Defendant Alam stated to Plaintiff that the

facility did not issue. Plaintiff informed Defendant Alam that he was aware that two I/I's within the housing unit had been issued "flat passes" by their medical provider recently. Defendant Alam then became irate with Plaintiff and requested for correctional staff to remove Plaintiff from his office.

22.    On or about the date of March 4, 2022, as a result of Defendant Alam's refusal to issue Plaintiff a temporary "flat pass," Plaintiff wrote a letter of complaint against Defendant Alam to Sing Sing's Deputy of Health, Ms. L. Jackson-Smith.

23.    Additionally, on the date of March 4, 2022, Plaintiff's family made a call of complaint against Defendant Alam for his refusal to issue Plaintiff a "flat pass," to NYSDOCCS's Central Office Medical Deputy Commissioner, Mr. John Morley, M.D., who then stated that he would contact Defendant Alam about the matter.

24.    On or about the date of March 12, 2022, Defendant Alam had Plaintiff called back to the medical unit in Sing Sing, where he displayed anger for Plaintiff's family calling his superior and lodging a complaint against him. Defendant Alam informed Plaintiff that he did not take lightly to Plaintiff's family making the complaint, and that he would address the matter with Defendant Capra.

25.    On or about the date of March 15, 2022, Plaintiff received a return letter from Sing Sing's Deputy of Health, Ms. L. Jackson-Smith stating the following:

> "We are in receipt of your letter dated 3/4/22. To obtain a flats/bus pass, it must be deemed by your medical provider as a need based on your medical disgnosis."
> [See exhibits]

26.    Thereafter, without being scheduled to see Plaintiff's medical health care provider, Defendant Alam, Plaintiff was sent a temporary "flat pass" via facility mail.

27.    On or about the date of March 21, 2022, Plaintiff was moved from the top tier P-Gallery to M-Gallery on the flats of A-block at Sing Sing. Thereafter, Plaintiff had not requested to be seen by Sing Sing's medical department, nor had Sing Sing's medical department make any requests to see Plaintiff concerning any medical issues with Plaintiff soreness to his back. Plaintiff further contends that Defendant Alam refused to make any kind of medical assessment, evaluation, x-ray or MRI of Plaintiff throughout the entire course of Plaintiff's confinement at Sing Sing.

28.    On or about the date of December 30, 2022, Plaintiff was elected by the I/I population at Sing Sing to become an elected member of the Incarcerated Individual Liaison Committee [herein-after "I/I ILC"]. Plaintiff's term as an elected member of the ILC was from January 1, 2022 to June 30, 2022. [See exhibits]

29.    During Plaintiff's term as an elected ILC member, Plaintiff had several negative interactions and altercations with Sing Sing's Executive Team, namely, Defendant Michael Capra [herein-after "Defendant Capra"], due to Plaintiff's submission of issues of concern on the ILC agenda. [See exhibits]

30.    Plaintiff's term as an ILC member was during the Coronavirus [hereinafter "COVID-19] pandemic, where Plaintiff and other ILC members had to keep the I/I population informed of Sing Sing's administration handling of the COVID-19 virus. At the height of

COVID-19, the NYSDOCCS had suspended all visitation within NYSDOCCS correctional facilities. However, as the COVID-19 virus resided, the NYSDOCCS issued a DOCCS COVID-19 DOCCS Report, issuing for all NYSDOCCS facilities to operate at thirty-three (33) percent capacity.

31.    On the date of January 7, 2022, NYSDOCCS issued another DOCCS COVID-19 Report, [See exhibits], requiring that all NYSDOCCS correctional facilities to operate at half capacity to facilitate social distancing. Plaintiff, along with other members  of the I/I ILC submitted an ILC agenda challenging Defendant Capra's failure to adhere to the NYSDOCCS visiting room protocols by making the transition from operating at thirty-three (33) percent to half capacity.

32.    During the monthly ILC meeting with Defendant Capra and his Executive Team, a fierce argument ensued between Plaintiff, the other members of the I/I ILC and Defendant Capra, concerning Defendant Capra's method to keep Sing Sing's visiting room operating at thirty-three (33) percent capacity. Which Defendant Capra stated that he would continue to operate at thirty-three (33) percent capacity as a means to prevent drugs and contraband from entering into the facility. Plaintiff informed Defendant Capra that the configuration of the visiting room tables and the lenghty distance between I/I's and their visitors were put into effect to reduce the spread of the COVID-19 virus, not to prevent drugs and contraband form entering into the facility. Plaintiff further informed Defendant Capra that the visiting room cameras and microphones were to prevent drugs and contra-band from entering into the facility. Defendant Capra stated to

Plaintiff that as long as drugs and cell phones were coming into the facility, he would do whatever he pleases.

33.    Additionally, during the course of Plaintiff's term as an I/I ILC member, Plaintiff submitted several letters of complaintf and ILC agendas to Defendant Capra and his Executive Team, regarding the unprofessional conduct of correctional employees physical and verbal assaultive behaviors towards the I/I population at Sing Sing. In the month of March 2022, the day that the ILC was to meet with Defendant Capra and his Executive Team for the monthly meeting, Defendant Capra cancelled the meeting. Plaintiff and the other ILC members were instead met by Defendants' Captain Nixon and Deputy of Program Velez. Plaintiff was informed by Defendant Nixon that Defendant Capra had cancelled the meeting because he was not pleased with the issues brough up on the ILC agenda, namely, the issue of staffs unprofessional conduct, and that if Plaintiff submitted another ILC agenda presenting the issue, Defendant Capra would, "Snatch our souls from our bodies and transfer the entire ILC."

34.    As a result of Defendant Capra and Nixon's statements, Plaintiff, in addition to the other I/I ILC members: I/I Michael Jones #90A5292; I/I A. Arriaga #06A0532; I/I J. Wilson #07A8212; I/I D. Hall #14A5057 and; I/I Sheldon Johnson #99A3011, wrote grievances against Defendant Capra, due to the threats made by Defendant Capra and the fear for their personal safety on account of the ILC agenda submitted.

35.    Subsequently, Defendant Cassandra Quick as Grievance Supervisor, willfully withheld Plaintiff and the other members

of the ILC grievance against Defendant Capra from being filed. Plaintiff further contends that Defendant Quick's wanton actions of withholding the grievances from being filed were founded upon Plaintiff's prior attempts to speak with I/I Grievance Representatives and Clerks concerning Defendant Quick's mis-handling and miscoding of grievances from the I/I population, and to place the matter on the ILC agenda.

36.    Plaintiff additionally wrote letters of complaint to the Correction Association of New York, New York State Assmeblyman, Mr. Edward Gibbs, and various other New York State Assembly-people, concerning Defendant Capra and his Executive Team.

37.    Approximately around the month of April 2022, the Correction Association of New York made a visit to Sing Sing and met with the I/I ILC and I/I Grievance Program to discuss issues concerning the facility. Which, Plaintiff and members of the I/I ILC and I/I Grievance Representatives and Clerks addressed Defendant Capra's refusal to adhere to the current NYSDOCCS COVID-19 visiting room protocols, as well as the unprofessional conduct of correctional employees physical and verbal assault towards the I/I population at Sing Sing. After the meeting with the Correction Association of New York and the I/I ILC and I/I Grievance representatives and clerks, the Correction Association of New York held a meeting with Defendant Capra and his Executive Team to discuss the ILC's concerns.

38.    On or about the month of April 2022, the ILC met with Defendant Capra and his Executive Team for the monthly ILC meeting. During the meeting Defendant Capra adamantly displayed

his disdain towards the ILC, namely Plaintiff, for speaking
with the Correction Association of New York about his failure to
adhere to the NYSDOCCS COVID-19 Visiting Room Protocols, and the
physical and verbal assaultive behaviors of his correctional
staff towards the I/I population. At the close of the ILC
meeting, Defendant Capra addressed Plaintiff personally and
stated to Plaintiff that he was sick and tired of Plaintiff's
antics and arrogance of going above his and his staffs heads
writing outside agencies, and getting them involved in facility
matters. Defendant Capra further stated to Plaintiff that
Plaintiff illustrated this same behavior with Defendant Alam,
and that it was Plaintiff who was the problem and not his
staff. Defendant Capra continued by stating to Plaintiff that,
if Plaintiff did not like what was going on in his facility,
Plaintiff can request to be transferred to another facility.
Plaintiff then responded to Defendant Cpara by stating that,
Sing Sing was not his facility, but the State's facility, and
that as Superintendent of the State's facility, Defendant Capra
had an obligation in fairness to address the issues. Defendant
Capra then stated to Plaintiff that he need not be told how to
do his job and that he would show Plaintiff who's facility
Sing Sing was.

39.     On or about the date of May 2022, Plaintiff submitted his
name for the upcoming ILC elections that were scheduled to be
held on June 27, 2022. However, due to the limited number of I/I's
interested in the ILC position on account of their reluctance
to deal with Defendant Capra and his Executive Team, Plaintiff

was automatically elected for a second term to address issues of concern to Defendant Capra and his Executive Team.

40.     On or about the date of June 30, 2022, Plaintiff spoke with Defendant Velez requesting to be moved to Building #5 located in Sing Sing. The request came from a shortage of I/I ILC representatives in that housing unit. Defendant Velez informed Plaintiff that there was no need for Plaintiff to be moved to a different housing unit because Plaintiff was not going to be housed at Sing Sing too much longer. Plaintiff asked Defendant Velez what did she mean by her statement. In which, Defendant Velez then asked Plaintiff if he was ambulatory. Plaintiff asked Defendant Velez what did the word ambulatory mean, and Defendant Velez then asked Plaintiff if he had to have surgery to get something removed or if Plaintiff had problem with walking or with his legs. Plaintiff informed Defendant Velez that he had no such problems. Defendant Velez then stated to Plaintiff that it did not matter because either way, Plaintiff was being transferred from Sing Sing.

41.     On or about the date of June 22, 2022, Plaintiff was placed on the draft and transferred from Sing Sing to Shawangunk Correctional Facility.

## VI. PLAINTIFF'S TRANSFER TO SHAWANGUNK

42.     On or about the date of July 10, 2022, Plaintiff filed a grievance at Shawangunk challenging Defendants' retaliatory transfer of him under the false pretenses of "medical need." The grievance was answered by Shawangunk's Deputy of Programs, Ms. Brennan [hereinafter "Deputy Brennan"]. In Deputy Brennan's

response to Plaintiff's grievance, Deputy Brennan had stated
that Plaintiff had been transferred to Shawangunk for medical
reasons.

43.    Thereafter, Plaintiff submitted a HIPPA Freedom of
Information Request [hereinafter "HIPPA F.O.I.L."] to view his
medical file. Plaintiff was then scheduled to view his medical
file with Nurse Practitioner/Administrator Ms. Ruiz. In which,
Planitiff and Ms. Ruiz found nothing within the file indicating
the need for Plaintiff to be transferred to a "flat facility,"
or anything indicating any need for Plaintiff to receive any
form of reasonable accommodations. However, Plaintiff did find
a medical file stating that Sing Sing's medical department found
that Plaintiff had normal spine and no physical limitations.
[See exhibits]

44.    On or about the date of October 2022, Plaintiff was
scheduled to see his Offender Rehabilitation Counselor, Ms.
Saldana [hereinafter "ORC Saldana"]. During Plaintiff's reivew,
Plaintiff explained to ORC Saldana that he had been transferred
from Sing Sing to Shawangunk based upon the false pretenses of
needing to be housed at a "flat facility." ORC Saldana then
looked at Planitiff's file on her computer and stated that she
did not see anything in Plaintiff's file or institutional
history restricting Plaintiff from any kind of work or lifting
based upon a medical need, or anything indicating the need for
Plaintiff to be issued any kind of reasonable accommodations.
ORC Saldana further stated to Plaintiff that those reasonable
accommodations would be needed for Plaintiff to be housed at a

flat facility, and that it was strange that Plaintiff did not have such in his files. Plaintiff then informed ORC Saldana that he would like to submit a transfer back to Sing Sing due to being transferred under an erroneous medical need. ORC Saldana then informed Plaintiff that she could submit a lateral transfer to Sing Sing, and that Plaintiff would have to request a transfer to either western or northern New York, and then submit another request to be transferred back to Sing Sing from there, in spite of being transferred to Shawangunk erroneously. However, ORC Saldana indormed Plaintiff that she would contact NYSDOCCS's Classification & Movement in Albany and explain the situation. ORC Saldana further informed Plaintiff that she would also contact the medical department at Shawangunk and schedule Plaintiff for an examination with the Nurse Practitioner/Administrator, Ms. Ruiz.

45.    Thereafter, Plantiff was screened by Shawangunk's Nurse Practitioner/Administrator, Ms. Ruiz, who determined that Plaintiff did not have any physical limitations or problems with walking, climbing stairs, or any impairments requiring for Plaintiff to be housed at a "flat facility." Nurse Practitioner/Administrator, Ms. Ruiz informed Plaintiff that someone down the line had to have made a mistake by transferring Plaintiff to this facility, because as of screening Plaintiff and reviewing Plaintiff's files she did not know why Plaintiff was transferred here.

46.    On or about the date of November 2022, Plaintiff's ORC, Ms. Saldana, sent Plaintiff a letter indicating that she had spoke with someone in NYSDOCCS's Classification & Movement, who

acknoweldged that Plaintiff had been erroneously transferred,
however, that Plaintiff would not be transferred back to Sing
Sing, and that Central Office found Shawangunk suitable for
Plaintiff.

47.    On or about the date of December 20, 2022, at approximately
2:00PM, Plaintiff spoke with Shawangunk's Deputy of Programs,
Deputy Brennan, concerning Plaintiff's transfer from Sing Sing to
Shawangunk. Plantiff's conversation with Deputy Brennan resulted
from Plaintiff speaking with Shawangunk's Superintendent, Mr.
McGuinness about Deputy Brennan's response to Plaintiff's
grievance when she was not medically inclinded to asnwer the
grievance, and Superintendent McGuinness directing Deputy Brennan
to inquire as to why Plaintiff had been transferred to Shawangunk.

48.    Deputy Brennan informed Plaintiff that she had spoken with
NYSDOCCS's Central Office, in which Central Office indicated that
at the time Plaintiff had been transferred from Sing Sing to
Shawangunk, Plaintiff had a medical need to be housed at
Shawangunk, however, that medical need no longer exists.
Plaintiff informed Deputy Brennan that her statement was untrue
and did not even make sense. Plaintiff informed Deputy Brennan
that, since his transfer from Sing Sing to Shawangunk, the only
time that he had been seen by medical here, was when he wrote to
his ORC, who then contacted medical, examined him, and determined
that he did not have any medical restrictions or need in his
medical file at any time. Deputy Brennan then informed Plaintiff
that Central Office determined that Shawangunk was suitable for
Plaintiff and that Plaintiff would not be transferred back to
Sing Sing.

49.    Plaintiff informed Deputy Brennan that he was transferred from Great meadow to Sing Sing pursuant to Correction Law § 72(c), and without an actual legitimate reason within the penological interest of the NYS Department of Corrections, it was a violation of Correction Law § 72(c) to transfer him. Plaintiff further informed deputy Brennan that, if Central Office had determined that Plaintiff had a legitimate medical condition, then Central Office would have transferred Plaintiff from Great Meadow directly to Shawangunk, and not from Great Meadow to Sing Sing, and from Sing Sing to Shawangunk. Additionally, Plaintiff stated that, although Central Office had found Shawangunk suitable for Plaintiff, it was not suitable to Plaintiff's family, which was why Correction Law § 72(c) was implemented. Nor did Shawangunk offer Plaintiff the same programming or living conditions as Sing Sing. Deputy Brennan then threatened Plaintiff to sue if he did not like being housed at Shawangunk because Plaintiff would no be transferred back to Sing Sing.

50.    Plaintiff then informed deputy Brennan that Plaintiff's ORC, Ms. Saldana had spoke with a Classification & Movement Analysis in NYSDOCCS's Central Office, who acknowledged the erroneous transfer, and that a supervisor in Central Office who approved Plaintff's transfer had to be aware also that he had been transferred under the false prestenses of medical. Deputy Brennan then informed Plaintiff that Shawangunk did not have anything to do with his transfer, and that Plaintiff should address his concerns with Central Office or the courts.

51.    Plaintiff bases this amended complaint on the grounds that Defendants' were fully aware of Plaintiff's transfer under the false pretenses of medical, and took no corrective action to cease the transfer out of their desire to retaliate against Plaintiff for the exercising of his First Amendment right to free speech and to redress his grievances.

### VII. PRAYERS FOR RELIEF

52.    Plaintiff requests an Order declaring that the defendants' have acted in violation of the United States Constitution.

53.    Plaintiff requests an injunction compelling for the NYSDOCCS to transfer Plaintiff back to Sing Sing Correctional Facility or, in the alternative, for Plaintiff to remained confined at Shawangunk Correctional Facility and for the NYSDOCCS's Ministerial & Family Serices to approve Plaintiff's Family Reunion Program application, to compensate Plaintiff and Plaintiff's family for the erroneous transfer.

54.    Plaintiff hereby requests compensatory damages from the Defendants' in the following amounts:

Plaintiff seeks $10,000 in compensatory damages from Defendant Michael Capra;

Plaintiff seeks $5,000 in compensatory damamges from Defendant Courtney Nixon

Plaintiff seeks no compensatory damages from Defendant Elane Velez

Plaintiff seeks $20,000 in compensatory damages from Defendant T. Alam

Plaintiff seeks no compensatory damages from Defendant Cassandra Quick

Plaintiff seeks $15,000 in compensatory damages from Defendant Kristen Trapalis

Plaintiff seeks $15,000 in compensatory damages from Defendant Jane Doe

55.    Plaintiff seeks $50,000 in punitive damages from Defendants' for abusing their position and status as an employee of the New York State Department of Correction & Community Supervision [NYSDOCCS], acting under the color

of State law to deprive Plaintiff of his rights guaranteed
by the Fourteenth Amendment to the United States
Constitution.

Signed this 29 day of December , 2023

_____
SEAN SALLEY

I declare under the penalty of perjury that the foregoing is true
and correct.

_____
SEAN SALLEY

December 29, 2023
Date

RECEIVED
46
0249-23

July 4, 2022

Grievance: On the date of June 27, 2022, I was transferred from Sing Sing C.F. to Shawangunk C.F. after being awarded an "Area of Preference" & "Close Proximity" transfer from Great Meadow C.F. to Sing Sing C.F. Which, Sing Sing C.F. is the closest facility to my home of New York City.

Pursuant to Correction Law § 72(c) requires DOCCS to place Incarcerated Individuals [hereinafter "I/I's"] in facilities that are in closest proximity to their minor children. Therefore, my transfer to Shawangunk without any disciplinary infractions & without a "legitimate" security interest is a violation of Correction Law § 72(c) & my 8th Amendment of the U.S. Constitution to be free of any cruel & unusual punishment. Which, being transferred further away from my family & friends, who exhibited a pattern of visitation at Sing Sing C.F., without cause constitues to a form of Cruel & unusual punishment.

Additionally, I was an elected member of the Inmate Liaison Committee [hereinafter "ILC"], which as in the NYSDOCCS directive governing ILC, No I/I shall be punished or transferred for recommending changes to a facility or presenting issues of concern of the I/I population. Which, due to the submission of several ILC agendas & grievances of threats made by Sing Sing C.F. Superintendent, Mr. Michael Capra, towards the ILC, it is clearly evident that I was transferred

as a Result. Moreover, I was scheduled to take the pre-college exam & in current litigation with my criminal case, & being transferred hindered these things.

Action Requested: For the NYSDOCCS to cease transferring I/I's for retalitatory Reasons when they bring up legitimate ILC concerns. That no future Reprisals be made against me for my constitutional Right to free speech & to address my grievances.

Mr. Sean Salley  #02A4785
A·1·111

**Cunningham, Michael H (DOCCS)**

| | |
|---|---|
| **From:** | Brennan, Lisa (DOCCS) |
| **Sent:** | Tuesday, July 12, 2022 12:50 PM |
| **To:** | Cunningham, Michael H (DOCCS) |
| **Subject:** | RE: SHG-0249-22 (Salley, S. 02A4785) |

I/I Salley was transferred to Shawangunk due to the fact that he required a flat facility for medical reasons.

SHG·0249-22

| NEW YORK STATE Corrections and Community Supervision | GRIEVANCE NO. | | HEARING DATE |
|---|---|---|---|
| | GRIEVANT NAME | | DIN |
| **INCARCERATED GRIEVANCE PROGRAM** | FACILITY | | HOUSING UNIT |
| **IGRC HEARING RESPONSE** | HELD IN ABSENTIA □ YES  □ NO    If yes, why: | | |

Response of IGRC:

Chairperson: _____     IGRC Members: _____

_____

_____

Date Returned to Grievant: _____

Appeal:

If you wish to appeal, please check the appropriate box below and return within 7 calendar days to the IGRC office at the facility where the grievance was filed.*

☐ I disagree with the IGRC response and wish to appeal to the Superintendent.     ☐ I have reviewed the Deadlocked response. Refer to Superintendent.

☐ I agree with the IGRC response and wish to appeal to the Superintendent     ☐ I want to apply to the IGP Supervisor for review of the IGRC dismissal.

Grievant Signature: _____     Date: _____

*An exception to the time limit may be requested under Directive #4040, § 701.6 (g).

**To be completed by Grievance Clerk**

Grievance Clerk Signature: _____     Date Received: _____

Date Forwarded to Superintendent For Action: _____

FORM 2131 (Reverse) (12/21)

| NEW YORK STATE Corrections and Community Supervision | GRIEVANCE NO. SHG-0249-22 | DATE FILED 07/11/22 |
| --- | --- | --- |
| | FACILITY Shawangunk Correctional Facility | POLICY DESIGNATION |
| **INMATE GRIEVANCE PROGRAM** | TITLE OF GRIEVANCE Illegal transfer | CLASS CODE 46 |
| **SUPERINTENDENT** Thomas McGuinness | SUPERINTENDENT'S SIGNATURE *S. Brennan, A/Supt.* | DATE 08/25/22 |
| GRIEVANT Salley, S. | DIN 02-A-4785 | HOUSING UNIT A1-111 |

Grievant complains he was not transferred due to retaliatory and false medical reasons. He wants DOCCS to cease transferring grievants without proper reasons.

Per DSP B..., the grievant was transferred due to the fact he required a flat facility for medical reasons. Incarcerated Individual transfers do not originate at the facility level. Grievant should contact Office of Classification and Movement with future transfer issues.

Grievance is denied.

**APPEAL STATEMENT**

If you wish to refer the above decision of the Superintendent, please sign below, and return this copy to your Inmate Grievance Clerk. You have seven (7) calendar days from receipt of this notice to file your appeal. * Please state why you are appealing this decision to C.O.R.C.

_____

_____

_____

| GRIEVANT'S SIGNATURE | DATE |
| --- | --- |

| GRIEVANCE CLERK'S SIGNATURE | DATE |
| --- | --- |

*An exception to the time limit may be requested under Directive #4040, section 701.6 (g)
Form 2133 (02/15)

 **Corrections and Community Supervision**

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

## MEMORANDUM

From:       Rachael Seguin, Director, Incarcerated Grievance Program

SUBJ:       Receipt of Appeal

Date:       11/29/2022

S SALLEY  02A4785
Shawangunk Correctional Facility
Your grievance SHG-0249-22 entitled
Improperly Transferred From PMC Facility For False
Medical Concerns
was rec'd by CORC on 10/27/2022

**A disposition will be sent to you after the grievance is reviewed by CORC**

**STATE OF NEW YORK – DEPARTMENT OF CORRECTIONS & COMMUNITY SUPERVISION**
**PHYSICAL EXAM**

Name: SALLEY, SEAN    DIN: 02A4765    DOB: 08/28/71    Facility: SSCF

Date of Exam 03/19/22    Reason for exam:    ☐ Initial    ☒ Update

| Vision | Uncorrected | Corrected | | Gross Hearing | Normal | Abnormal | Hearing Aid |
|--------|-------------|-----------|--|---------------|--------|----------|-------------|
| Right  |             | 20/20     |  | Right         | ✓      |          |             |
| Left   |             | 20/20     |  | Left          |        |          |             |

**Current Complaint(s):** ☒None ☐ Yes (Specify- Use Form 3105 for additional information)

_____

_____

*Any abnormal finding or declination of examination **must** be documented.  **All** declinations **must** be accompanied by Form 3195 Refusal of Medical Examination and/or Treatment*

| Vital Signs | |
|-------------|--|
| Temp:   | 97.6°F |
| Pulse:  | 78/min |
| Resp    | 16 |
| BP:     | 120/76 |
| O2 Sat  |  |
| HT:     | 5'9" |
| WT:     | 154/155 |
| Initials | TA |

| Examination | Normal | Abnormal | Declined* |
|-------------|--------|----------|-----------|
| Behavior    | ✓      |          |           |
| Speech      | ✓      |          |           |
| Gait        | ✓      |          |           |
| Head        | ✓      |          |           |
| Eyes        | ✓      |          |           |
| Ears        | ✓      |          |           |
| Nose        | ✓      |          |           |
| Throat      | ✓      |          |           |
| Neck        | ✓      |          |           |
| Breasts     | ✓      |          |           |
| Lungs       | ✓      |          |           |
| Chest       | ✓      |          |           |
| Heart       | ✓      |          |           |
| Lymph Nodes | ✓      |          |           |
| Musculoskeletal | ✓  |          |           |
| Spine       | ✓      |          |           |
| Neurologic  | ✓      |          |           |
| Extremities | ✓      |          |           |
| Abdomen     | ✓      |          |           |
| Skin        | ✓      |          |           |
| Groin       |        |          | ✓         |
| Rectal      |        |          | ✓         |
| Genitalia   |        |          | ✓         |
| Females: LMP | N/A   |          |           |



**Abnormal Finding(s)/Diagnosis:** _____

NONE _____

_____

**General Appearance:** ____ NORMAL ____

_____

**Physical Limitation(s):** ____ NONE ____

_____

☐ Check here if additional information is noted on AHR Form 3105 (AHR Progress Note)

Hepatitis C Screening Offered?  ☐ Yes  ☐ No  ☐ Unknown  ☒ | Medical Classification Level  ☐ 1  ☐ 2  ☒ 3

Provider Signature _____    180    03/10/22    2:32 PM
                                                Provider #    Date    Time

**This information is protected under PHL Law 27F prohibiting further disclosure.**
**A general authorization is not sufficient for release**

Form 3101B (12/16)    Distribution:  Original (white) –History & Physical Tab    Copy (yellow)—Dental Record

NEW YORK STATE DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION

## SHAWANGUNK CORRECTIONAL FACILITY
### GUIDANCE AND COUNSELING

## MEMORANDUM

TO: _Salley, S_                DIN# _02AY785_  OC: _AH111_

FROM: _A Scudena_ (, ORC/SORC

SUBJECT: YOUR CORRESPONDENCE regarding letter dated _10/10/22_

DATE: _10/11/22_

_____ This will acknowledge receipt of your letter. Further research is necessary before I can respond.

_____ Changes to your phone list will not be done until you have met with your Counselor during the month of your quarterly review. Directive 4423

_____ Your letter is unclear. Please explain and be specific.

_____ Your transfer/reclassification has been approved/denied.

_____ A decision has not been rendered about your classification/transfer. Write back in _____.

_____ Your program request has been submitted.

_____ You are on the waiting list for _____.

_____ Your letter was received, and you are on the waiting list for _____, we put most of the class in based off your ERD (Earliest Release Date).

_____ Please explain why you need an interview so that adequate preparations can be made.

_____ I will meet with you on _____.

_____ Your certificate (s) has been received and placed into your Guidance and Counseling folder.

_____ Requests for program changes must be mailed to the Program Committee. You cannot change your program until you have been in it at least 90 days.

_____ Your FRP application is still under review in Central Office.

_____ You must write to _____.

_____ Your letter has been forwarded to _____ as they are in the best position to assist you with this matter.

___✓___ Other: _I am waiting to hear from Medical. As you can see - why you were called down I have been in touch with them about your situation. I have also contacted_

NOTE: _Class and movement. Once I hear from Medicare - I will be able to move on to next step._
_Thank you -_

CC:    FILE

**NEW YORK-DEPARTMENT OF CORRECTIONAL SERVICES**
**GREAT MEADOW CORRECTIONAL FACILITY**

**INMATE:**      SALLEY, S.                    DIN:    02A4785

**CELL:**        E1-04

**FROM:**        IGRC OFFICE

**DATE:**        7/8/2021

**SUBJECT:**      Your Grievance Number

We received your  grievance that you wrote pertaining  **MOVING CLOSER TO FAMILY**

It has been issued number   **GM# ,598-21**   The Grievance Office is presently investigating your complaint. When the investigation has been completed you will be given a call out to discuss your complaint with a Grievance Representative or to have a hearing on the matter.

If you are keeplocked, in  BHU or SHU, or if you are housed on D-1 your grievance will be heard by the Grievance Committee in your absence. Therefore, if you have any further documentation that you may need to add to your grievance please send it to the Grievance Office once you receive this notice that your grievance has been recieved and is being investigated so that all the facts pertaining to your grievance can be taken into account.

If you are not keeplocked, please bring any documentation to the Grievance Office which will help to further resolve or substantiate your complaint when you recieve a callout for hearing.

_____          _____
DIN:



**Corrections and Community Supervision**

ANDREW M. CUOMO
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

### *REVISED* NOTICE TO INCARCERATED POPULATION

### CORRECTION LAW § 72(C)

A new Correction Law §72(c) was recently signed into law and requires DOCCS to place incarcerated individuals in facilities that are in closest proximity to their minor (under age 18) child/children where practicable, if it is in the best interest of the child/children, and the incarcerated individual consents. DOCCS is currently making changes to gather the necessary data to implement this new law. This law will take effect **12/23/2021.**

In preparation of implementation, we will need additional information regarding your minor child or children, the custodial parent and the child or children residence(s). Beginning *JUNE* 2021, Offender Rehabilitation Coordinators will be collecting this information over the course of several months during the scheduled Case Plan Quarterly Interviews.

To assist you in preparing for upcoming interviews, the below information will be required for all children in consideration of your proximity to minor child(ren) transfer eligibility.

- Full legal name of each child
- Child's date of birth(s)
- Child's relationship i.e. biological child, stepchild, adopted child
- Name of person with whom your child resides
- Your relationship to the person with whom your child resides i.e. spouse, parent, grandparent
- Physical address where your child resides
- County where your child resides
- Telephone number of the person with whom your child resides
- Whether the person with whom your child resides has legal custody of the child
- Types of contact you are having with your child i.e. visitation, secure messages via tablet, telephone calls, written correspondence
- If you want to be considered for placement in close proximity to this child

If you have children residing in multiple regions, you will need to select which child you are requesting to be considered for a proximity to minor child transfer.

Additional information will be distributed as protocols for implementation of the laws are finalized.

**POST ON ALL HOUSING UNITS, GENERAL LIBRARY, AND LAW LIBRARY UNTIL 04/30/2022.**



**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

**TO:**         Salley, Sean 02A4785

**FROM:**       Michael Capra, Superintendent

**SUBJECT:**    ***RESPONSE TO CORRESPONDENCE***

**DATE:**       February 28, 2022

There is no incarcerated individual with a flat pass who is not on the flats.  Where incarcerated individuals are housed and what gallery will be opened is none of your concern.

MC:mb

cc:     Guidance file
        Author



NEW YORK STATE | Corrections and
Community Supervision

KATHY HOCHUL
Governor

ANTHONY J. ANNUCCI
Acting Commissioner

**TO:**       INCARCERATED POPULATION

**FROM:**    H. Richardson, Correction Sergeant (ILC Staff Advisor)

**SUBJECT:**  ILC Election/ ILC Representatives

**DATE:**     June 15, 2022

The upcoming ILC Elections are tentatively scheduled to be held in HBB Monday <u>**June 27, 2022**</u>

The eligible ILC candidates are as follows:

    <u>HBB</u>

    Ratcliff, Daniel -- 17A0010       HBB-T-51
    Hall , Dequan -14A5057         HBB-Z-06
    Harris, Sheldon – 09A4531      HBB-V-27
    Herrera, Joel -- 12A3157        HBB-V-66
    Edwards, Raheem -06A6473     HBB-W-11

Day of election, the ballots will be distributed to each incarcerated individual in the housing unit at the 4:00pm count by housing unit officers. Incarcerated individuals not in the housing unit ie. Mess Hall, Chapel, etc. will be afforded the opportunity to vote at their assigned program via ILC staff. Ballots will be collected prior to the completion of the count by the ILC Staff Advisor and IGP Officer. Ballots will be counted under the supervision of the ILC Staff Advisor and IGP Officer.

   o   After all of the votes have been tallied, the results will be posted on the incarcerated individual bulletin boards.

Due to the limited number of incarcerated individuals interested in the ILC position, there will be no elections in HBA, HB5, and HB7. The ILC Representatives for HBA, HB5, and HB7 are as follows:

    <u>HBA</u>
    Johnson, Sheldon -99A3011     HBA- M-38
    Jones, Michael -90A5292      HBA- P-55
    Salley, Sean -02A4785        HBA-M-48

    <u>HB5</u>
    Brooks, S 11A5244          HB5- B-8

    <u>HB7</u>
    Rivera, H 84A0068         HB7 E-11

 **NEW YORK STATE**

## Corrections and Community Supervision

**KATHY HOCHUL**
Governor

**ANTHONY J. ANNUCCI**
Acting Commissioner

**TO:**        INCARCERATED POPULATION

**FROM:**    C. Giribaldi, Correction Sergeant (ILC Staff Advisor)

**SUBJECT:**  ILC Representatives 1/1/22- 6/30/22

**DATE:**      December 30, 2021

**HBA:**

Salley, S        02A4785

Vacant

Vacant

**HBB:**

Chapman, T        09A2676

Vacant

Vacant

**HB5:**

Wilson, J        07A1282

Vacant

**HB7:**

Arriaga, A        06A0542.

NOTE: Do not forward your name, DIN, and signatures of supporters for vacancy positions until a notice indicating a special election will be held.  Any and all names, DIN, and signatures of supporters received will be discarded.

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SING SING CORRECTIONAL FACILITY
INCARCERATED LIAISON COMMITTEE

Staff Advisor: Sgt. C. Giribaldi
Chairperson: Anthony Arriaga
Secretary: Michael Jones

To:  Michael Capra, Superintendent
Fr:  Incarcerated Individual Liaison Committee
Dt:  ILC Agenda - March 2022
Re:  March 2, 2022

Pursuant to Directive #4002, which deems the Inmate Liaison Committee legislative in function, the following constitutes the issues brought forth to this administration for legislation, clarification or resolution.

## ISSUE #1: FEMALE STAFF ARE ACTING UNPROFESSIONALLY

Population have been on the receiving end of very unprofessional acts by female staff while other supervisors and co-workers stand by without correcting or resolving the unprofessional behavior; which clearly violates numerous sections of the NYSDOCCS Employee Manual. The specific issues complained of are not limited to, but including: specific female staff, inappropriate and unprofessional communications, cursing, screaming, racial slurs, negative attitude/demeanor, ignoring an I/I in need, hanging out, leaving their post to hang out in other areas without properly being relieved and not signing in their presence in that area in the appropriate logbook, etc...

## SUGGESTION/RESOLUTION REQUESTED:

Female staff should be reminded that their job duty is under color of law and to act in a professional manner that does not jeopardize the safety and security of the facility and violates the employee manual. Fellow co-workers and supervisors should immediately intervene when they observe female staff act unprofessionally to deescalate or prevent any situation.

## ISSUE #2: WATER SAFETY & QUALITY (LEGIONNAIRE'S & H. PILORI)

Men in population are requesting for the water quality to be tested at the facility including requesting for an annual drinking water quality report for 2022 from the Village of Ossining Water System.

## SUGGESTION/RESOLUTION REQUESTED:

A test to be conducted regarding the water quality by the appropriate agency and such report to be posted for population to review.

## ISSUE #3: MESS HALL CONDITIONS

The Mess hall is one of the few programs that ran continuously throughout the entire duration of the pandemic, non-stop, and they will have to continue working whether things get better or worse.

### A) Mess hall Showers

The showers in the Mess hall are located in the basement of the kitchen. There is a memo in the

NEW YORK STATE | **Corrections and Community Supervision**

KATHY HOCHUL
Governor

ANTHONY J. ANNUCCI

### INCARCERATED INDIVIDUAL LIAISON COMMITTEE MEETING MINUTES
#### March 2022

**Present:**

| | | |
|---|---|---|
| M. Capra, Superintendent | | |
| J. Wood, FDS | Battle, N | #94A4242 |
| A. Helms, DSA | Chapman, T | #09A2676 |
| M. Marchese, Steward | Arriaga, A | #06A0542 |
| C. Nixon, Captain Acting DSS | Wilson, J | #07A8212 |
| E. Velez, ADSP | Jones, M | #90A5292 |
| C Hill, ADSP PREA | Hall, D | #14A5057 |
| L. Jackson-Smith  DSH | Salley, S | #02A4785 |
| C. Giribaldi, IILC Staff Advisor | | |

*Superintendent Capra reviewed memo issued by*
**Anthony J. Annucci, Acting Commissioner**
HALT Law - Impact on Sanctions and Location of Confinement
Superintendent Capra reviewed
Directive #4002 Incarcerate Liaison Committee

**Superintendent Capra stated as a result of the poorly written and inappropriately conveyed IILC agenda, the response will be as follows:**
The role of the IILC is to represent and efficiently convey the desires, need for clarity, and request for possible positive changes as requested by the population as a whole.  There is absolutely no room for personal complaints or agendas.
History would reflect I support most if not all ideas or suggestions for positive programming, special events and community outreach initiatives, so I believe it is understood that this administration has been a great advocate to the incarcerated population of Sing Sing C.F. Most of your demands in this agenda have been denied. I did state that we could revisit population issues during the April's IILC meeting providing the agenda is articulated and conveyed with respect and the appropriate decorum.

_____          _____
Superintendent                                                    Date

_____          _____
 ILC Member                                                       Date
MC:mb
cc:    J. Collado, Acting Asst. Comm.                    ILC Chairman
        M. Damore, CIU Director                            Exec Team      ILC Sgt.

STATE OF NEW YORK
DEPARTMENT OF CORRECTIONS AND COMMUNITY SUPERVISION
SING SING CORRECTIONAL FACILITY
INCARCERATED LIAISON COMMITTEE

Staff Advisor: Sgt. C. Giribaldi
Chairperson: Anthony Arriaga
Secretary: Michael Jones

To:  Michael Capra, Superintendent
Fr:  Incarcerated Liaison Committee
Dt:  April 20, 2022
Re:  **AMENDED ILC Agenda - April 2022**

Pursuant to Directive #4002, which deems the Incarcerated Liaison Committee legislative in function, the following constitutes the issues brought forth to this administration for legislation, clarification or resolution.

**ISSUE#1: COMMUNICATION BETWEEN THE ADMINISTRATION AND THE ILC:**

**ILC SUGGESTIONS:**
Open to discussion

---

Anthony Arriaga
06-A-0542
ILC Chairman

Michael Jones
90-A-5292
ILC Secretary

---

Sgt. Richardson
ILC Staff Advisor

To: 1st Deputy Superintendent, Mr. Wood
From: Mr. Sean Salley #02s4785, HBA-ILC Representative
Cell Location: HBA-M-48
Date: May 18, 2022
RE: Unprofessional Conduct by Staff


During a previous discussion pertaining to the unprofessional conduct of correctional employees within the facility, the ILC was advised to find a better method to address the issue than placing it on the monthly agenda. Therefore, I am writing this with the attempts to address the issue.

Deputy Wood, there are several  known employees within the facility that have exhibited a propensity for assaulting I/I's, cursing at I/I's and, acting in a "hood" manner. Due to Sing Sing Correctional Facility having a large percentile of African-American and Latino employees coming from urban environments within New York City, the problem lies with many employees failure to make a transition from that "hood"mentality to a  "professional" working mentality that they are required to have as a civil servant of the State of New York. This is the root of the problem to many incidents within the facility between staff and I/I's.

Pursuant to a Memorandum dated 3/2/17, titled "**Conduct within the Workplace**," Acting Commissioner Anthony Annucci discussed instances where staff where accused of using discriminatory and inflammatory language within the workplace that were deemed hateful in nature. Acting Commissioner Annucci further went on to state that *if any employee is in the receipt of such conduct, that said employee shall promptly file a complaint or report with the Office of Diversity Management, so the matter can be thoroughly investigated.* Additionally, it was stated that *any Supervisory or managerial employee who observes or otherwise becomes aware of such conduct, **must** report such conduct so it can be investigated.* With that cited, the problem lies with supervisors at this facility who not only observe many incidents but stand by idle and not address the employee's behavior. In many instances the supervisory officer present is also a key participant in the assaultive and unprofessional behavior.  More importantly, there are numerous instances where supervisors fail to report the employees conduct as mandated by Acting Commissioner Annucci. When these instances happen, it creates the bigger problem as to where employees feel that their behaviors are tolerated and there will be no repercussions for their actions.

If This Administration would like for the I/I population to have structure and pursue a path of betterment. A pivotal question must be posed. If the I/I population sees that there is no structure amongst the correctional staff, then how can one expect for the I/I population to have structure amongst themselves and pursue a path of betterment? Because as it currently stands, excluding I/I's in 5 Building and 7 Building, I/I's in HBA and HBB feel that their needs are being neglected, their grievances are not being heard, and that the facility is allowing for them to be victimized by the conduct and actions of certain correctional employees. For example, I/I's feel that the facility allows for the facility's search team to operate as a "gang" and victimize I/I's in HBA and HBB by assaulting I/I's and taking their rightfully owned personal property. The root of the problem is not the search team performing their job and searching. But, the search team possessing that same "hood" mentality and operating as a "gang" by instilling fear, taking property and their assaultive behaviors. In other words, it is the "hood" mentality that correctional staff possesses at this facility which must be addressed.

To: 1st Deputy Superintendent, Mr. Woods
From: Mr. Sean Salley #02a4785, HBA-ILC Representative
Cell Location: HBA-M-48
Date: May 6, 2022
RE: Visits Being Terminated Due To Limited Visiting Room Capacity

I am writing this letter in allusion to I/I complaints. Their visits are terminated due to limited visiting room capacity, which additionally has caused frustration and discouragement in visitors.

Deputy Woods, Sing Sing is the closest facility to New York City. Its visiting room will, most likely, need to seat a large number of visitors at all times. As of January 7, 2022, Central Office instructed all facilities within the State of New York to operate at 50% capacity. Thus, requiring for this facility to operate at a capacity of at least 175 people on the visiting room floor (Maximum capacity of visiting room is 350 people).

With the maximum capacity currently being 150 people on the visiting room floor, this would mean that there are 32 tables with a single I/I seated at each table. Each table is designed to seat up to three (3) visitors, allowing ninety-six (96) visitors to be seated at each table. Adding thirty-two (32) I/I's that have the maximum amount of three (3) visitors at each table, leaves us with the total number of hundred twenty-eight (128) people on the visiting room floor. *Therefore, there should be an additional ten (10) tables for this facility to meet the guidelines that all facilities will operate at half capacity to facilitate social distancing.*

What becomes problematic is the fact that this facility makes no distinction in seating arrangements between an I/I that have one (1) visitor or an I/I that has two (2) or (three (3) visitors. For example, if an I/I only has one (1) visitor, he is still seated at a table designed to seat three (3) visitors. In essence , this adds additional tables and takes up unused space that does not allow for the facility's visiting room to be able to operate at half capacity. In courtesy, the facility should reconfigure the visiting room seating to accommodate I/I's with a single visitor. Especially being that the COVID guidelines does not allow for additional visitors to enter the facility if they are not processed in together.

Deputy Woods, previously the problem with the visiting room capacity and visiting room staff terminating visits only affected I/I's with visits on the weekend. However, currently visits are being terminated almost every day throughout the weekday. With gas prices reaching a near record high of $4.51 per gallon, it is quite costly and inconvenient for visitors to travel to this facility to spend more time waiting to be processed into the facility, than the actual time they spend with their visitor. Therefore, ILC would like to discuss the following possible options with the administration to seek Central Office's approval:

- Extending visitation to 6:00pm. This would allow for I/I's and their visitors to spend more time before the space is needed and visits are terminated. Provides a longer time for visitors to enter the facility.
- Reinstituting Night Visitation: At one point, the NYSDOCCS allowed night visitation from the hours of 6:00pm-9:00pm.
- Reconfigure the visiting room seating to accommodate I/I's with single visitors.
- Add 10 tables to operate at half capacity.

the facility.

- Reinstituting Night Visitation: At one point, the NYSDOCCS allowed night visitation from the hours of 6:00pm-9:00pm.
- Reconfigure the visiting room seating to accommodate I/I's with single visitors.

Thank you very much for your time and patience concerning this matter, and we hope to receive a response from you when your time permits. Please enjoy your day!

Respectfully Submitted,

_Mr. Sean Salley #02a4785_

Mr. Sean Salley #02a4785
HBA ILC Representative

CC: Central Office, Deputy of Program Services, Mr. Jeff Mckoy
    Superintendent, Michael Capra
    Deputy of Programs, Ms Velez
    Deputy Superintendent for Security, Mr. Thrope

To: Superintendent, Mr. Capra
From: Mr. Sean Salley #02A4785, ILC A-Block Rep
Cell Location: HBA-P-67
Date: February 23, 2022
RE: Visiting Room Procedures

I am writing this in allusion to the visiting rooms continued use of being divided into specific segments, (i.e. the extra table dividing incarcerated persons and their visitors).

As of February 22, 2022, the facility implemented new Mess hall seating arrangements, where during the COVID there were four people to a table spanning every other seat. Now there are seven people to a table within two feet of each other. However, the population feels that if you can minimize the distance in seating in the Mess hall, then you should be able to minimize the distance in the seating during visitation.

As it currently stands, the facility visiting room is operating on an outdated policy of less than half capacity. However, pursuant to the NYSDOCCS's website (enclosed) "Notice Regarding Statewide Visitation Modification" updated January 7, 2022. It states that visiting rooms will operate at half capacity to facilitate social distancing. Therefore, the extra table can be removed and the visiting room can still operate at half capacity and social distance.. As the Superintendent of the facility you have the discretion to remove the extra table without seeking Central Office's approval. Being that the level of vaccination rate is so high, and the COVID positivity is extremely low, you have the discretion to remove said tables and still function within the guidelines of Central Office's policies regarding COVID restrictions.

Therefore, the population is respectfully requesting that the tables be removed. Thank you very much for your time and patience concerning this matter. Please enjoy your day!

Respectfully Submitted,

Mr. Sean Salley

cc.:    Central Office
        Correctional Association of NY
        NYS Governor, Ms. Hochul

| NEW YORK STATE **Corrections and Community Supervision** | GRIEVANCE NO SS-0680-22 (con) | | DATE FILED 6/3/22 |
|---|---|---|---|
| | FACILITY SING SING | | POLICY DESIGNATION Institutional |
| INCARCERATED GRIEVANCE PROGRAM | TITLE OF GRIEVANCE Visiting | | CASE CODE 5 |
| **SUPERINTENDENT RESPONSE** | SUPERINTENDENT'S SIGNATURE | | DATE 8/8/22 |
| GRIEVANT Johnson, S | | DIN 99A3011 | HOUSING UNIT HBA M-38 |

Grievant states the 6/1/22 graduation held in the Sing Sing CF visit room violated the COVID-19 testing and social distance guidelines, therefore the normal visits should have the same standards.

Grievance Denied. The June 1, 2022 graduation ceremony guidelines were approved by Central Office, however, at the time this complaint was filed, there were no changes to the normal visiting COVID-19 safety precautions and guidelines.  July 1, 2022 the COVID-19 restrictions were lifted with a few additional safety caveats.

Note: The duplicative filing of SS-0680-22 is currently under investigation.

**APPEAL STATEMENT**

If you wish to appeal the above decision of the Superintendent, please sign below and return this copy to the IGRC at the facility where the grievance was filed. You have seven (7) calendar days from receipt of this notice to file your appeal.* Please provide a reason why you are appealing this decision to CORC.

_____                    _____
GRIEVANT'S SIGNATURE                                                      DATE

_____                    _____
GRIEVANCE CLERK'S SIGNATURE                                       DATE

*An exception to the time limit may be requested under Directive #4040, section 701.6 (g)

RECEIVED

Sailey, S.
02-A-4285

0714-21

SING SING I.G.P.

I AM WRITING THIS GRIEVANCE IN ALLUSION TO THE
ACTIONS BY CORRECTIONAL OFFICERS AT THIS FACILITY FOR MY PREVIOUS
GRIEVANCE & FORMAL COMPLAINTS AGAINST THEM. THE RETALIATION IS IN
RELATION TO THE INCIDENT OUTLINED IN GRIEVANCE #0636-21.

ON THE DATE OF OCTOBER 20, 2021, WITHOUT ANY BODY CAMERA DEVICES,
C.O. GONZALES & C.O. MARSICO, BADGE #59463 OF THE SEARCH TEAM,
SEARCHED MY CELL & CONFISCATED A PAIR OF GUCCI SNEAKERS & LOUIS
VUITION BELT FROM ME. THEIR REASON FOR CONFISCATING THESE ITEMS
WAS DUE TO THEIR BELIEF THAT THE SNEAKERS & BELT WERE OVER-
PRICED.

PURSUANT TO DIRECTIVE #4911, IT STATES THAT ALLOWABLE FOOTWEAR
MUST BE ACCOMPANIED WITH A RECEIPT NOT TO EXCEED THE COST OF
$50.00. IT MUST BE DULY NOTED THAT THERE IS NOTHING WITHIN
DIRECTIVE #4911, THAT STATES THAT "NO DESIGNER FOOTWEAR." IS NOT
ALLOWED. WITH THAT CITED, AT THE TIME THAT I RECEIVED MY GUCCI
SNEAKERS. I WAS CONFINED AT WENDE CORRECTIONAL FACILITY
[HEREINAFTER "WENDE"]. IN WHICH THE COMPANY THAT I PURCHASED THE
SNEAKERS FROM PROVIDED THE FACILITY WITH AN $50.00 RECEIPT (THE
COST OF FOOTWEAR IN DIRECTIVE #4911 HAS BEEN REVISED TO $80). AT
THE TIME I HAD RECEIVED MY SNEAKERS, WENDE'S PACKAGE ROOM
OFFICERS HAD COMPLAINTS THAT BECAUSE THE COMPANY CHARGED $200.00
SHIPPING + $150.00 FOR HANDLING, THE COMPANY WAS TRYING TO
CIRCUMVENT AROUND DIRECTIVE #4911'S PRICE LIMIT. SEVERAL
GRIEVANCES WERE WRITTEN ON THE MATTER AND CORC STATED THAT IT WAS
NOT UP TO THE FACILITY TO DICTATE THE PRICES OR THE SHIPPING &
HANDLING A COMPANY MAY CHARGE FOR THEIR PRODUCTS. CORC FURTHER
RENDERED THAT A FACILITY'S ONLY CONCERN IS THAT THE ITEMS ARE
ACCOMPANIED WITH A LEGITIMATE $50 RECEIPT. THEREAFTER, INMATES
WERE ALLOWED TO RECEIVE THEIR FOOTWEAR. IN WHICH, AT THAT TIME MY
BOSS THE IGP SERGEANT, SERGEANT SADONI TOOK ME TO THE PACKAGE
ROOM TO RETRIEVE MY SNEAKERS.

THEREAFTER, I HAVE HAD THESE SAME SNEAKERS SINCE MY TRANSFER FROM
WENDE TO SULLIVAN CORR. FACILITY, FROM SULLIVAN TO GREEN HAVEN
CORR. FACILITY, FROM GREEN HAVEN TO GREAT MEADOW AND FROM GREAT
MEADOW TO SING SING CORR. FACILITY. WHICH THEY WERE ALLOWED IN
UPON MY RECEPTION. WHICH, IT SHOULD BE NOTED THAT I HAVE GONE
THROUGH NUMEROUS TRANSFERS & CELL SEARCHES WITHOUT ANY INCIDENTS.

GROUNDS RAISED

IF AN INMATE MEETS THE REQUIREMENTS OF PROVIDING A $50, OR
CURRENTLY $80 RECEIPT, & THE ITEMS ARE ALLOWED INTO THE FACILITY.
THEN, IT IS NOT AT THE DISCRETION OF ANY OFFICER THEREAFTER TO
CONFISCATE THE ITEMS BECAUSE OF THEIR PERSONAL BELIEF OF WHAT
THEY FEEL THE ITEM IS WORTH. AS CENTRAL OFFICE HAS CORRECTLY
STATED, "IT IS NOT THE VALUE OF THE ITEM, BUT THE PRICE OF THE
ITEM CONTAINED IN THE RECEIPT. THERE IS NOTHING WITHIN DIRECTIVE
#4911 STATING THAT ANY OFFICER CAN CONFISCATE & DISALLOW ANY ITEM
FOR THEIR BELIEF OF WHAT THE ITEM IS WORTH. THEREFORE, C.O.
GONZALES & C.O. MARSICO DID NOT HAVE A RIGHT UNDER THE DIRECTIVES
& POLICIES OF THE NYSDOCCS TO CONFISCATE MY PERSONAL PROPERTY.

NO CORRECTION OFFICER HAS THE AUTHORITY TO CREATE THEIR OWN DIRECTIVES, POLICY & PROCEDURES OR RULES & REGULATIONS, AND MUST ADHERE TO THE ONES ALREADY IN PLACE BY THE NYSDOCCS. AGAIN, DIRECTIVE #4911, CLEARLY OUTLINES THE REQUIREMENTS & RESTRICTIONS FOR FOOTWEAR. WHICH IT DOES NOT INDICATE THAT INMATES ARE NOT ENTITLED TO RECEIVE DESIGNER FOOTWEAR. HOWEVER, IT DOES OUTLINE THAT THE PRICE IS NOT TO EXCEED $95.00 & MUST BE ACCOMPANIED WITH A RECEIPT. WHICH GRIEVANT SATISFIED ALL OF THE NECESSARY REQUIREMENTS THAT THE NYSDOCCS & THE DIRECTIVE SET FORTH. IN ADDITION, THE DIRECTIVES STATE THAT IF A FACILITY BELIEVES AN ITEM TO BE WORTH MORE THAN THE VALUE ON THE INMATES RECEIPT  THEN IT SHALL PROVIDE THE INMATE WITH PERMIT STATING THAT IF SUCH PROPERTY IS LOST OR DAMAGED, THE INMATE WILL ONLY BE ENTITLED TO THE VALUE ON THE RECEIPT.

IN LIEU OF DIRECTIVE #4911, CORRECTIONAL OFFICERS AT THIS FACILITY HAVE A WELL KNOWN PROPENSITY FOR CONFISCATING INMATES PERSONAL PROPERTY FOR THEIR OWN PERSONAL OPINIONS & BELIEFS. WHICH THERE ARE NO DIRECTIVES, POLICY & PROCEDURES OR ANY THING WRITTEN FROM CENTRAL OFFICE GIVING THEM LEGITIMATE GROUNDS FOR THE CONFISCATION OF SUCH PROPERTY.

ACTION REQUESTED: (1) THAT MY SNEAKERS & BELT BE RETURNED TO ME AS THEY WERE WRONGFULLY CONFISCATED; (2) TO BE GIVEN THE NAME OF THE SUPERVISOR WHO IS AUTHORIZING ALL OF THESE CELL SEARCHES OF MY CELL & TO BE PROVIDED WITH COPIES OF THE COMPUTER GENERATED CMC CELL SEARCH SLIPS FROM CENTRAL OFFICE AUTHORIZING THE CELL SEARCHES. (3) THAT OFFICERS ON THE SEARCH TEAM BE REQUIRED TO WEAR A BODY CAMERA WHEN CONDUCTING SEARCHES OF INMATES CELLS.

RESPECTFULLY SUBMITTED,

MR. SEAN SALLEY #02A4795
CELL LOCATION: A-P-57
OCTOBER 22, 2021

RECEIVED

OCT 26 2021

SING SING I.G.P.

State of New York
**Department of Corrections**
**& Community Supervision**
**Sing- Sing Correctional Facility**
354 Hunter Street
Ossining, New York 10562
914-941-0108

Anthony J. Annucci
Acting Commissioner

Micheal Capra
Superintendant

# MEMORANDUM

**TO:**        **SALLEY, S**        **02A4785**        **P-67**

**FROM:**        Ms. Q. QUICK, I.G.P. SUPERVISOR

**SUBJECT:**        GRIEVANCE COMPLAINT

**DATE:**        10/26/2021

Your complaint dated     **10/26/2021**     code#     **50**     filed as grievance #   **0714-21**

titled:     **CLAIMS OFFICERS CONFISCATED FOOTWEAR AND BELT ARBITRARILY**

is currently under investigation by the Inmate Grievance Program Staff.

At the completion of our invetigation you will be informed of any infromal resolution
suggetion or you will be scheduled for a hearing.

---

INMATE GRIEVANCE PROGRAM, SCHOOL BUILDING, ROOM 101

To: IGP Supervisor, Ms. Quick
From: Mr. Sean Salley #02a4785
Cell Location: HBA-M-48
Date: June 3. 2022
RE: Grievance

**Grievance:**

On June 1, 2022, Sing Sing Correctional facility conducted a graduation ceremony on the visiting room floor for the graduates of the *Hudson Link/Mercy College program*. During this graduation ceremony, *all social distancing protocols that are being enforced during the course of normal visitation (Directive #4403) were discarded*. Furthermore, *none of the participants or visitors attending this graduation ceremony was tested for COVID prior to entry into the facility; as mandated for visitors during the normal course of visiting (Directive #4403)*.

Pursuant to Directive #4403(III)(B) Visiting Spaces: *"No inmate shall be deprived of visiting privileges available to inmates in the general population."* Although this specific section of the Directive refers to facilities with more than one visiting area, Sing-Sing's administration has effectively "deprived" grievant of "visiting privileges being afforded to" college graduates and participants of the recent Carnegie Hall and forthcoming John Legend/Common concerts in violation of the 14th Amendment *"which forbids a State deny any person within its jurisdiction the Equal Protection of the Law" which means "that all persons similarly situated should be treated alike." Grievant is similarly situated to the college graduates and must be treated equally.*

**ACTION REQUESTED:**
1. That the I/I Visitor program be held to the same standards that these Concerts & Graduation ceremonies are being held;
2. that I/I Visitor program be held to the same standards that these concerts/graduation ceremonies are being held, absent mandatory COVID testing protocol ;
3. In the alternative, that the facility create additional visiting space per Directive #4403 *removing social distancing and COVID testing* protocols for I/I and visitors who can show proof of vaccination, which would afford for the fair and equal treatment in accordance to NYS Constitutional Law, under the 11th Amendment.
4. That the video recording from the June 1, 2022, Graduation ceremony be preserved and utilized as evidence to substantiate grievant's claims.

Respectfully Submitted,

CC: Governor Kathy Hochul

Additionally many I/I feel that the only I/I that this facility caters to are the ones who are in college. As a whole in number, the approximate number of I/I at this facility is 1700. As a whole the approximate number of I/I's at this facility in college are 136. Which many of those I/I housed in 5 Building and 7 Building and are not being subjected to the same psychological and physical abuse that I/I's in HBA and HBB are being subjected to. This is coupled with the fact that there are many I/I's within the population that feel that the facility will not remove the tables on the visit for them to simply be able to be closer to their loved ones or allow a Family Day Event, but will allow a graduation for the college I/I's and allow for them to be with their families and loved ones. Which the termination of many I/I's visits and the facility's denial of visitors because of their clothing must also be factored into the equation. Deputy Wood, this places misplaced frustration amongst the I/I population and whether this administration chooses to acknowledge it or not, any person being subjected to adverse psychological & physical abuses, a failure to be heard and/or neglected, coupled with other hardships, will cause an extreme amount of psychological turmoil upon any person.

Deputy Wood, I write this not to be combative or even with any hostility. I write this with the hopes that we can address the root of the problems to create a more productive environment that will encourage more I/I's to find ways to do their time constructively. Sing Sing has always been known for its college and good programs it offers. However, it is equally important for this facility's overall atmosphere and the handling of its I/I population as a whole, to equally match college and the constructive programs that this facility offers. Therefore, the ILC would like to meet with administration and discuss viable ways to make this possible.

Thank you very much for your time and patience concerning this matter and I hope to receive a response from when your time permits. Please enjoy your day!

Respectfully Submitted,

Mr. Sean Salley

CC: Superintendent, Mr. Michael Capra
    Deputy For Program Services, Ms. Velez

**SECTIONS**

Regular
Update
(#regular-
update)

**DOCCS
Confirmed
Incarcerated
Population
By Facility**
(#doccs-
confirmed-
incarcerated-
population-
by-facility)

Preparedness
(#preparedness)

What
DOCCS Is
Doing
(#what-
doccs-is-
doing)

New
Protocols

nt of Corrections and Community Supervision (/)



OCCS COVID-19 Report

# Regular Update

## Notice Regarding Statewide Visitation Modification

### Updated January 7, 2022

As we continue to monitor the effects of COVID-19 within our institutions and in the outside communities, particularly with the Omicron variant, we are seeing an unprecedented increase in the

Protoc

(#new-

protocols)

SECTIONS

COVID-19

Resources

Update 19-

(#resources)

update)

DOCCS

Confirmed

Incarcerated

Population

By Facility

(#doccs-

confirmed-

incarcerated-

population-

by-facility)

Preparedness

(#preparedness)

What

DOCCS Is

Doing

(#what-

doccs-is-

doing)

New

Protocols

continues to be the safety and well-being of our employees and those individuals within our care, custody and supervision, particularly during this public health emergency.

Recognizing the importance of family and visitation, while being mindful of the critical need to continue protecting staff and the incarcerated population within our facilities, we will continue with visitation at this time. However, <u>the Department currently requires all visitors age 2 years and up, including those visitors arriving for the Family Reunion Program, regardless of vaccination status, to take a COVID-19 test on site, with a home test kit provided by the Department.</u>

Visitors will be provided their home test kit at the facility processing area. The visitor will exit the facility, self-test, either in their vehicle or other area, and return for continued processing only if they have tested negative. Each visitor must present the negative test to the officer in order to be processed.

***It is strongly recommended that visitors traveling to a facility by bus get tested prior to boarding the bus. This will not only prevent riders from endangering the health of other passengers, but will also ensure visitors do not make the trip, only to be denied entry to a facility following a positive test. Please note:

2/23/22, 8:42 AM

DOCCS COVID-19 Report | Department of Corrections and Community Supervision

**Protocol**

**(#new-**    TOP ⌃ (#top)    **DOCCS COVID-19 Report**

**protocols)**

**SECTIONS**

**COVID-19**

**Resources** Resources

**Update** COVID-19-

(#resources) (#resources)

**update**

**DOCCS**

**Confirmed**

**Incarcerated**

**Population**

**By Facility**

**(#doccs-**

**confirmed-**

**incarcerated-**

**population-**

**by-facility)**

**Preparedness**

**(#preparedness)**

**What**

**DOCCS Is**

**Doing**

**(#what-**

**doccs-is-**

**doing)**

**New**

**Protocols**

In addition, the previously announced criteria will also remain in effect:

- Visiting rooms will operate at half capacity to facilitate social distancing. Facilities with outside visiting areas will utilize such areas if weather permits.

- All visitors, incarcerated individuals and staff will be required to wear a mask during processing and during the visit, regardless of vaccination status or proof of a negative test result.  Masks may be temporarily removed for processing, and while eating or drinking items purchased from the vending machines.  Masks must not have any pictures, writings, or sayings on them.  If a visitor does not have a mask, the visit will be denied.

- Visitors will be screened with the questionnaire and temperature check prior to being allowed to visit.  In facilities with a hospitality center, the screening shall occur at the entrance to the hospitality center.

- No physical contact will be allowed.

- Visiting will be divided into specific segments of the population (i.e., alpha by name or numeric by DIN) to ensure that each incarcerated individual can have two weekend visits per month, as published on our website.  Weekday visiting at maximum security facilities will remain in place.

- Each visit will be limited to three adult visitors (unless the current facility policy specifies less) and one child, under the age



SHAWANGUNK CORRECTIONAL FACILITY
P.O. BOX 700
WALLKILL, NEW YORK 12589
NAME: Mr. Sean Salley   DIN: 03A4785

Legal Mail

JAN 08 2024
S.D.N.Y.

Clerk
United States District Court
Southern District of New York
The Daniel Patrick Moynihan
U.S. Courthouse - 500 Pearl Street
New York, NY 10007-1312