UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SEAN SALLEY,

                                    Plaintiff,

          v.                                             No. 23-CV-4566 (KMK)

MICHAEL CAPRA, *et al.*,                                 <u>OPINION AND ORDER</u>

                                    Defendants.

<u>Appearances:</u>

Sean Salley
Wallkill, NY
*Pro Se Plaintiff*

Michael J. Keane, Esq.
Office of the Attorney General of New York
New York, NY
*Counsel for Defendants*

KENNETH M. KARAS, United States District Judge:

        Sean Salley ("Salley" or "Plaintiff"), proceeding pro se, brings this Action against

Michael Capra ("Capra"), Courtney Nixon ("Nixon"), Elane Velez ("Velez"), T. Alam ("Alam"),

Cassandra Quick ("Quick"), Kristen Trapalis ("Trapalis") and Jane Doe ("Doe") (collectively,

"Defendants"), pursuant to 42 U.S.C. § 1983 for alleged violations of his First Amendment

rights.  Before the Court is Defendants' Motion to Dismiss the Amended Complaint pursuant to

Federal Rule of Civil Procedure ("Rule") 12(b)(6) (the "Motion").  (*See* Not. of Mot. (Dkt. No.

41).)

        For the reasons discussed below, the Court denies in part and grants in part Defendants'

Motion.

I.   <u>Background</u>

A.  <u>Factual Background</u>

The Court will take all well-pleaded factual allegations in the Amended Complaint ("AC") as true for the purposes of this Motion.  *See Buon v. Spindler*, 65 F.4th 64, 69 n.1 (2d Cir. 2023) ("The factual summary below is derived from the allegations in the [complaint], which we must accept as true in reviewing a motion to dismiss.").

1.  <u>Plaintiff's Back Injury</u>

In 2022, Plaintiff—who is incarcerated—was transferred from Great Meadow Correctional Facility to Sing Sing Correctional Facility ("Sing Sing"), pursuant to a recently enacted New York state statute requiring incarcerated individuals with minor children to be placed in correctional facilities proximate to those children.  (*See* Amended Complaint ("AC") ¶¶ 18–19 (Dkt. No. 21).)

On or about March 4, 2022, Plaintiff injured himself while exercising and visited Defendant Alam, who was his assigned primary healthcare provider.  (*See id.* ¶¶ 20–21.)  Alam gave Plaintiff a temporary prescription for Nabumetone.[1]  (*See id.* ¶ 21.)  Plaintiff also requested a "flat[s] pass" presumably to deal with his back pain.[2]  (*See id.*)   Plaintiff's flats pass request was initially denied by Alam, who told Plaintiff that Sing Sing "did not issue" flats passes.  (*See id.*)  After Plaintiff informed Alam that he knew of two other Sing Sing inmates who had in fact

---

[1] Nabumetone is an anti-inflammatory drug used to treat mild to moderate pain.  *See Nabumetone*, MAYO CLINIC (March 01, 2025), https://www.mayoclinic.org/drugs-supplements/nabumetone-oral-route/description/drg-20069686 [https://perma.cc/2F8N-B9R2].

[2] A flats pass "allows an inmate to be transferred to the first floor of the prison."  *Williams v. Fisher*, No. 02-CV-4558, 2003 WL 22170610, at *2 n.4 (S.D.N.Y. Sept. 18, 2003).

2

received flats passes, Alam became "irate" with Plaintiff and "requested [that] correctional staff . . . remove Plaintiff from his office."  (*See id.*)

After this interaction, Plaintiff wrote a complaint to Sing Sing's Deputy of Health, and his family made a "call of complaint" to the New York State Department of Corrections and Community Supervision's ("NYS DOCCS's") Central Office Medical Deputy Commissioner, Dr. Morely, who told Plaintiff's family he would contact Alam about the matter.  (*See id.* ¶ 22.) Alam called Plaintiff back into his office on March 12, 2022, and castigated Plaintiff for lodging a complaint against him, informing Plaintiff that "he did not take lightly to Plaintiff's family making the complaint," and informing Plaintiff that he intended to "address the matter" with Defendant Capra, the Superintendent of Sing Sing.  (*See id.* ¶¶ 3, 24.)

On or about March 15, 2022, Plaintiff received a return letter from Sing Sing's Deputy of Health, Ms. Jackson-Smith, stating that her office had received Plaintiff's request for a flats pass, but that in order to obtain such a pass, Plaintiff's medical provider was required to determine that Plaintiff had such a need pursuant to a medical diagnosis.  (*See id.* ¶ 25.)  Later, without being scheduled to see Alam, Plaintiff was issued a "temporary 'flat[s] pass'" by mail.  (*See id.* ¶ 26.) He was then moved from the "top tier P-Gallery to M-Gallery on the flats of A-block."  (*See id.* ¶ 27.)

Plaintiff did not request a follow-up visit, nor did Sing Sing's medical department request that Plaintiff come in for any follow-up visit regarding the soreness in his back.  (*See id.* ¶ 27.) Plaintiff alleges that Alam refused to make any further medical assessments of Plaintiff while he was confined at Sing Sing.  (*See id.*)

3

2.  <u>Plaintiff's Election to the Incarcerated Individual Liaison Committee ("ILC")</u>

On December 30, 2022, Plaintiff was elected by the incarcerated population of Sing Sing to serve on the ILC.  (*See id.* ¶ 28.)  During his term as an ILC member, Plaintiff "had several negative interactions and altercations" with members of Sing Sing's Executive Team, including Capra.  (*See id.* ¶ 29.)

Plaintiff's term on the ILC occurred during the COVID-19 pandemic, which Plaintiff alleges was the impetus for many of his disputes with the administration.  (*See id.* ¶¶ 29–32.)  At the height of the COVID-19 pandemic, NYS DOCCS suspended all visitation to its facilities.  (*See id.* ¶ 30.)  Later, this guidance was revised, and facilities were permitted to operate at 33 percent capacity for visitations.  (*See id.*)  On January 7, 2022, the guidance was updated once again, and NYS DOCCS required facilities to operate visitations at 50 percent capacity.  (*See id.* ¶ 31.)  Capra failed to follow this requirement, and visitation remained at 33 percent.  (*See id.*)

Plaintiff, along with other members of the ILC, submitted an ILC agenda challenging Capra's continuation of the 33 percent cap.  (*See id.* ¶ 32.)  At the monthly ILC meeting, a "fierce argument" ensued between ILC members and Capra.  (*See id.*)  Capra stated that he would maintain the reduced visitation capacity to prevent drugs and contraband from entering the facility.  (*See id.*)  Plaintiff responded that reduced visitation capacity was meant to prevent the spread of COVID-19, not to prevent drugs and contraband from entering the facility.  (*See id.*)  Capra told Plaintiff that so long as drugs and cell phones were entering the facility, "he would do whatever he please[d]."  (*See id.*)

Plaintiff also submitted a number of complaints as a member of the ILC regarding the "unprofessional conduct of correctional employees['] physical and verbal assaultive [sic] behaviors towards [inmates] at Sing Sing."  (*See id.* ¶ 33.)  In March 2022, Capra cancelled the

monthly ILC meeting.  (*See id*.)  Plaintiff was then allegedly informed by another member of

Sing Sing staff that Capra had cancelled the meeting "because he was not pleased with the issues

brough[t] up on the ILC agenda," and, in particular, the issue of the "staff['s] unprofessional

conduct."  (*See id*.)  Plaintiff alleges the staff member told him that if he "submitted another ILC

agenda presenting the issue, [Capra] would '[s]natch [their] souls from [their] bodies and transfer

the entire ILC.'"  (*See id*.)

   Disagreements between Capra, the Sing Sing Executive Team, and the ILC (including

Plaintiff) culminated in a meeting between the Correction Association of New York and the Sing

Sing Executive Team (including Capra) regarding the ILC's grievances.  (*See id*. ¶ 37.)  This

meeting was the result of grievances submitted by Plaintiff and the rest of the ILC

representatives.  (*See id*.)

   After this meeting, in April 2022, Capra and the Executive Team met with the ILC.  (*See

id*. ¶ 38.)  Plaintiff alleges Capra treated him with disdain for speaking with the Correction

Association of New York.  (*See id*.)  Specifically, Capra allegedly told Plaintiff that "he was sick

and tired of Plaintiff's antics and arrogance" and Plaintiff "going above [Capra] and his staff['s]

heads" in getting outside agencies "involved in facility matters."  (*See id*.)  Capra likened

Plaintiff's complaints to the Correction Association of New York with his complaints regarding

Alam.  (*See id*.)  Capra allegedly told Plaintiff that if he did not like "what was going on in [Sing

Sing]" Plaintiff could request to be transferred to another facility.  (*See id*.)  Capra also allegedly

told Plaintiff that he did not need to be told "how to do his job" and that he would "show

Plaintiff [whose] facility Sing Sing was."  (*See id*.)

   At this point the timeline of events becomes slightly muddied.  In May 2022, Plaintiff

submitted his name for the upcoming ILC elections, which were slated for June 27, 2022.  (*See

*id.* ¶ 39.)  According to Plaintiff, on June 22, 2022, Plaintiff was placed "on the draft" and transferred from Sing Sing to Shawangunk Correctional Facility ("Shawangunk").  (*See id.* ¶ 41.)  Nevertheless, on June 27, 2022, Plaintiff was elected for a second term on the Sing Sing ILC "to address issues of concern to [] Capra and his Executive Team."  (*See id.* ¶ 39.)  Three days later, Plaintiff was told by Velez that he would not be "at Sing Sing too much longer."  (*See id.* ¶ 40.)  In any event, by July 10, 2022, Plaintiff alleges that he was an inmate at Shawangunk.  (*See id.* ¶ 42.)

3. <u>Investigation at Shawangunk</u>

On July 10, 2022, Plaintiff—now an inmate at Shawangunk—filed a complaint alleging that his transfer from Sing Sing was retaliatory.  (*See id.* ¶ 42.)  His grievance was answered by Shawangunk's Deputy of Programs, Ms. Brennan ("Deputy Brennan").  (*See id.*)  Deputy Brennan responded to Plaintiff, telling him that he had been transferred "for medical reasons." (*See id.*)

Thereinafter, Plaintiff submitted a HIPPA FOIL request to view his medical file.  (*See id.* ¶ 43.)  Plaintiff viewed his file with a nurse practitioner/administration, Ms. Ruiz.  (*See id.*)  Both Plaintiff and Ms. Ruiz allegedly found no information in Plaintiff's file suggesting he needed any kind of accommodation—including that he needed to be moved to a flat facility.  (*See id.*)  In fact, Plaintiff alleges he found a file stating that Sing Sing's medical department found he had a "normal spine and no physical limitations."  (*See id.*)

Plaintiff also spoke to his Offender Rehabilitation Counselor, Ms. Saldana ("ORC Saldana").  (*See id.* ¶ 44.)  ORC Saldana allegedly told Plaintiff that she had not found "anything in Plaintiff's file" indicating he required accommodations, and that such documentation would be necessary to effect a transfer based on medical need.  (*See id.*)  Plaintiff was also examined by

Ms. Ruiz, who determined that he "did not have any physical limitations or problems with

walking, climbing stairs, or any impairments requiring Plaintiff to be housed in a 'flat facility.'"

(*See id*. ¶ 45)

ORC Saldana was allegedly told by the NYS DOCCS Central Office that Plaintiff was

transferred "erroneously."  (*See id*. ¶ 46.)  Deputy Brennan informed Plaintiff that she had been

told that at the time of Plaintiff's transfer, he had a medical need that necessitated a transfer,

"however, that medical need no longer exist[ed]" by the time Plaintiff complained to

Shawangunk's administrators about his transfer.  (*See id*. ¶ 48.)

B.  <u>Procedural Background</u>

Plaintiff filed his Complaint on May 30, 2023.  (*See* Dkt. No. 1.)  Plaintiff filed an

Amended Complaint ("AC") on January 8, 2024.  (*See* AC.)  Defendants filed their Motion to

Dismiss the AC on June 7, 2024.  (*See* Not. of Mot. to Dismiss ("Not of Mot") (Dkt. No. 41);

Mem. of Law in Supp. Mot. to Dismiss ("Defs. Mem.") (Dkt. No. 42).)  Plaintiff filed his

Opposition to the Motion on July 12, 2024.  (*See* Pl. Aff. in Supp. of Mem. in Opp. Mot. to

Dismiss ("Pl. Mem.") (Dkt. No. 46).)  After requesting and receiving an extension of time, (*see*

Dkt. Nos. 47, 49), Defendants filed their Reply Memorandum of Law in Support of the Motion

on August 5, 2024, (*see* Def. Rep. in Supp. of Mot. to Dismiss ("Defs. Rep.") (Dkt. No. 51)).

II.    <u>Discussion</u>

A.  <u>Standard of Review</u>

Federal Rule of Civil Procedure 12(b)(6) allows a defendant to seek dismissal of a

plaintiff's claim based on "failure to state a claim upon which relief can be granted."  Fed. R.

Civ. P. 12(b)(6).  At the motion to dismiss stage, a court must "draw all reasonable inferences in

[the] plaintiff's favor, 'assume all well-pleaded factual allegations to be true, and determine

whether they plausibly give rise to an entitlement to relief.'" *United States v. Medtronic, Inc.*, No. 18-CV-1628, 2024 WL 4165522, at *3 (S.D.N.Y. Sept. 12, 2024) (quoting *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011)).

To survive a motion to dismiss, the Supreme Court has held that a complaint "does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration adopted) (internal quotation marks and citation omitted). However, "a [plaintiff's] obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* Rule 8 of the Federal Rules of Civil Procedure "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "Nor does a complaint suffice if it tenders naked assertions devoid of further factual enhancement." *Id.* (alteration adopted) (internal quotation marks and citation omitted). Rather, a complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563, and a plaintiff must allege "only enough facts to state a claim to relief that is plausible on its face," *id.* at 570. Certainly, if a plaintiff has not "nudged [his] claim[] across the line from conceivable to plausible, the[] complaint must be dismissed." *Id.*; *see also Iqbal*, 556 U.S. at 679 ("Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense. But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.'" (alteration adopted) (internal quotation marks and citation omitted) (quoting Fed. R. Civ. P. 8(a)(2))).

When a plaintiff proceeds pro se, the Court may consider "materials outside the complaint to the extent that they are consistent with the allegations in the complaint." *Bailon v. Pollen Presents*, No. 22-CV-6054, 2023 WL 5956141, at *5 (S.D.N.Y. Sept. 13, 2023) (quotation marks omitted), including "documents that a pro se litigant attaches to his opposition papers," *Barkai v. Neuendorf*, No. 21-CV-4060, 2024 WL 710315, at *4 (S.D.N.Y. Feb. 21, 2024) (quoting *Agu v. Rhea*, No. 09-CV-4732, 2010 WL 5186839, at *4 n.6 (E.D.N.Y. Dec. 15, 2010) (italics omitted)).  Moreover, where, as here, a plaintiff proceeds pro se, the Court must "construe his complaint liberally and interpret it 'to raise the strongest arguments that it suggests." *Mejia v. Carter*, No. 21-CV-9049, 2022 WL 17653826, at *3 (S.D.N.Y. Nov. 2, 2022) (internal quotations and citations omitted), *report and recommendation adopted*, No. 21-CV-9049, 2022 WL 17624254 (S.D.N.Y. Dec. 13, 2022).  Notwithstanding a standard of review comparatively more lenient and favorable to pro se litigants, such treatment "does not exempt a pro se party from compliance with relevant rules of procedural and substantive law." *Barkai*, 2024 WL 710315, at *4 (quoting *Bell v. Jendell*, 980 F. Supp. 2d 555, 559 (S.D.N.Y. 2013)); *see also Caidor v. Onondaga County*, 517 F.3d 601, 605 (2d Cir. 2008) ("[P]ro se litigants generally are required to inform themselves regarding procedural rules and to comply with them." (italics and citation omitted)).

B. Analysis

1. Remaining Defendants

At the outset, the Court takes stock of the remaining Defendants in this case.  Plaintiff concedes that he has failed to state a claim against Defendants Nixon, Velez, Trapalis, Quick,

and Doe. (*See* Pl. Mem. 5, 9, 14.)[3]  Therefore, those Defendants are dismissed from this case. *See Cavanagh v. Columbia Sussex Corp.*, No. 19-CV-2515, 2021 WL 4356042, at *4 (E.D.N.Y. Sept. 24, 2021) (dismissing defendants from the litigation where the plaintiff conceded any claims against those defendants); *Hudson v. Heath*, No. 12-CV-1655, 2014 WL 4364897, at *5 (N.D.N.Y. Aug. 29, 2014) (same).

Therefore, the only Defendants who remain at this stage of the litigation are Capra and Alam.

2. <u>First Amendment Retaliation</u>

"The Second Circuit has instructed district courts to view 'prisoner retaliation claims with skepticism and particular care, because virtually any adverse action taken against a prisoner by a prison official[—]even those otherwise not rising to the level of a constitutional violation[—]can be characterized as a constitutionally proscribed retaliatory act.'" *Baltas v. Snyder*, No. 24-CV-1487, 2025 WL 509423, at *4 (D. Conn. Feb. 14, 2025) (quoting *Dolan v. Connolly*, 794 F.3d 290, 295 (2d Cir. 2015)).

To state a claim for First Amendment retaliation, Plaintiff is required to plausibly plead: "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and

---

[3] Plaintiff only names Defendants Nixon, Velez, Trapalis, and Doe as those to be dismissed on page nine of his Memorandum of Law, but because he includes Defendant Quick in his list of Defendants to be dismissed elsewhere (*see* Pl. Mem. 5, 14), the Court determines the omission on page nine to be a mistake.  In any event, because Plaintiff failed to defend his inclusion of Quick in his Opposition, the Court deems his claim against Quick abandoned.  *See Golub v. Berdon LLP*, No. 19-CV-10309, 2022 WL 1228025, at *4 (S.D.N.Y. Apr. 26, 2022) (dismissing a claim as abandoned where the plaintiff had failed to respond in his opposition to the defendant's arguments as to why it should be dismissed); *Black Lives Matter v. Town of Clarkstown*, 354 F. Supp. 3d 313, 318 n.1 (S.D.N.Y. 2018) (same).

the adverse action." *Samuels v. New York Dep't of Lab.*, No. 23-CV-8004, 2025 WL 27737, at
*4 (S.D.N.Y. Jan. 3, 2025) (quotation marks omitted) (quoting *Dolan*, 794 F. 3d at 294).

Regarding protected activity, "it is well established that 'retaliation against a prisoner for
pursuing a grievance violates the right to petition government for the redress of grievances
guaranteed by the First and Fourteenth Amendments and is actionable under § 1983.'" *Dolan*,
794 F.3d at 294 (quoting *Graham v. Henderson*, 89 F.3d 75, 80 (2d Cir.1996)); *see also Baltas*,
2025 WL 509423, at *5 (same); *Wright v. Doe*, No. 24-CV-5711, 2025 WL 41677, at *4
(S.D.N.Y. Jan. 2, 2025) (same).

Here, Plaintiff has adequately alleged that he engaged in protected speech when he
submitted a number of grievances regarding prison conditions, both in regard to Defendant
Alam's denial of his request for a "flat[s] pass" and Plaintiff's position as a member of the ILC.
(*See* AC ¶¶ 22, 31–33, 36–37.)  *See Arriaga v. Annucci*, No. 23-CV-1941, 2024 WL 1743300, at
*11 (S.D.N.Y. Apr. 23, 2024) ("Because plaintiff alleges he raised a number of issues both by
filing grievances on his own behalf and through his participation in the ILC, he has sufficiently
alleged facts to satisfy the first element [of a First Amendment retaliation claim].");   *Dolan,* 794
F.3d at 295 (holding that "voicing grievances on behalf of a prison population as a member of an
inmate grievance body, such as the ILC[,]" is protected conduct).

"As to the second prong, the Second Circuit has defined adverse action as retaliatory
conduct that would 'deter a similarly situated individual of ordinary firmness from exercising his
or her constitutional rights.'" *Baltas*, 2025 WL 509423, at *5 (quoting *Hayes v. Dahlke*, 976
F.3d 259, 274 (2d Cir. 2020)).  Although "a prisoner has no liberty interest in remaining at a
particular correctional facility," *see Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998), "it is well
established that transfers may be adverse actions," *Arriaga*, 2024 WL 1743300, at *11.

11

Here, Plaintiff alleges his transfer to Shawangunk "was not suitable to [his] family," and was materially worse than Sing Sing in that it did not offer Plaintiff "the same programming or living conditions." (*See* AC ¶ 49.) These allegations are sufficient, at this stage, to plead that Plaintiff's transfer constituted an adverse action. *See Arriaga*, 2024 WL 1743300, at *11 (finding the second prong of a First Amendment retaliation claim met where, inter alia, the plaintiff's transfer "made it more expensive and time consuming for his family to visit him"); *Brown v. Cunningham*, No. 15-CV-5093, 2017 WL 627463, at *3 (S.D.N.Y. Feb. 14, 2017) (holding that the plaintiff's transfer was adverse because "he would no longer be able to participate in certain educational programs or reentry programs, and because his loved ones would be farther away").

As to the third prong, "a plaintiff may establish causation either directly through a showing of retaliatory animus, or indirectly through a showing that the protected activity was followed closely by the adverse action." *Arriaga*, 2024 WL 1743300, at *11 (alteration adopted) (quoting *Smith v. County of Suffolk*, 776 F.3d 114, 118 (2d Cir. 2015)). "Some of the facts often used to determine retaliatory motive include (1) temporal proximity between the protected conduct and the alleged retaliatory act, (2) the prisoner's prior good disciplinary record, (3) a finding of not guilty at the disciplinary hearing, and (4) statements by the officials showing motivation." *Raynor v. Trumell*, No. 24-CV-1270, 2025 WL 375073, at *6 (D. Conn. Feb. 3, 2025) (quoting *Ramos v. Semple*, No. 18-CV-1459, 2019 WL 2422875, at *2 (D. Conn. June 10, 2019)).

Here, Capra allegedly made a number of statements to Plaintiff which may be construed as direct evidence of retaliatory animus. For example, Plaintiff alleges that he was told by another member of prison staff that Capra would "[s]natch [the ILC members'] souls from [their]

12

bodies and transfer the entire ILC" if they ever submitted another ILC agenda containing certain grievances.  (*See* AC ¶ 33.)  After a heated exchange regarding Plaintiff's complaint to the Correction Association of New York, Defendant Capra allegedly told Plaintiff he was "sick and tired of [his] antics and arrogance of going above [Capra's] and his staffs['] heads," and that if Plaintiff "did not like what was going on in [Capra's] facility" he could "request to be transferred to another facility."  (*See id.* ¶ 38.)

Alternatively, the temporal proximity between Plaintiff's complaints and his transfer is also sufficient to plausibly establish causation.  The Second Circuit has refused to draw a "bright line" to define "the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Espinal v. Goord*, 558 F.3d 119, 129 (2d Cir. 2009); *see also Walker v. Senecal*, 130 F.4th 291, 301 (2d Cir. Mar. 6, 2025) (same); *Keith v. Mahar*, No. 24-CV-1391, 2024 WL 5077348, at *7 (N.D.N.Y. Dec. 11, 2024) (same).  The Second Circuit, however, suggested that a passage of six months is sufficiently close temporal proximity to establish causation.  *See Espinal*, 558 F.3d at 129.  Here, the AC plausibly alleges Plaintiff filed his last complaint against Sing Sing in April 2022.[4]  (*See* AC ¶¶ 33–36.)  Plaintiff was transferred by July 2022.  (*See id.* ¶¶ 41–42.)  At most, the time between Plaintiff's grievance and his transfer was four months, a sufficiently close time period to suggest that his transfer was the product of his protected activity.  *See Espinal*, 558 F.3d at 129 ("[W]e find that the passage of only six months between [the protected activity and adverse action] . . . is sufficient to support

---

[4] Though the AC does not specifically allege the precise date when Plaintiff filed grievances with the Correction Association of New York, the chronology of the allegations strongly implies the grievances were filed between March and April of 2022.  (*See* AC ¶¶ 33–36.)

an inference of a causal connection."); *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cnty.*, 252 F.3d 545, 555 (2d Cir. 2001) ("We are particularly confident that five months is not too long to support [an allegation of causation] . . . ."); *cf. Clark v. Boughton*, No. 21-CV-1372, 2022 WL 4778582, at *10 (D. Conn. Oct. 3, 2022) (holding a period of eight months was not too lengthy to suggest causation in a First Amendment retaliation claim).

As to personal involvement, the Court finds that Plaintiff has sufficiently pled Defendants' involvement in Plaintiff's retaliatory transfer. "An individual may be held liable under . . . Section 1983 only if that individual is personally involved in the alleged deprivation." *Clark*, 2025 WL 473634, at *4 (quoting *Littlejohn v. City of New York*, 795 F.3d 297, 314 (2d Cir. 2015)); *Baltas*, 2025 WL 509423, at *4 ("It is well settled in this Circuit that 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.'" (quoting *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994))).

Although Plaintiff does not directly allege that Capra directed Plaintiff's transfer in the AC, he does do so in his Opposition.[5]  (*See* Pl. Mem. 10 (alleging Capra transferred him out of Sing Sing).)  Furthermore, Plaintiff alleges a number of facts which give rise to a plausible inference that Capra was personally involved in Plaintiff's transfer.  First, Capra was the Superintendent of Sing Sing, and thus likely had the authority to initiate Plaintiff's transfer.  (*See* AC ¶ 3.)  Capra repeatedly threatened to transfer Plaintiff if he did not stop filing grievances,

---

[5] The Court is permitted to consider new allegations raised in a pro se plaintiff's opposition papers.  *See Applewhite v. N.Y.C. Dep't of Educ.*, No. 21-CV-2928, 2024 WL 3718675, at *1 n.3 (E.D.N.Y. Aug. 8, 2024) (holding that the court can consider new allegations raised in a pro se plaintiff's opposition); *Pierre v. N.Y.C. Fire Dep't*, No. 22-CV-7425, 2024 WL 360662, at *2 n.2 (E.D.N.Y. Jan. 31, 2024) ("Although the general rule is that a plaintiff may not raise new allegations in her opposition to a motion to dismiss, because [the p]laintiff is representing herself, [the court] will consider both the allegations in the [a]mended [c]omplaint and in [the p]laintiff's [a]ffidavit in [o]pposition in deciding the motion.").

(*see id.* ¶¶ 33, 38), Plaintiff in fact did not stop filing grievances, (*see id*. ¶¶ 34, 36), and he was transferred a short time after his last grievance, (*see id*. ¶ 42). Second, the purported reason for Plaintiff's transfer—that he had a medical condition requiring that he be moved to a different facility—does not appear to be supported by his medical records. (*See id*. ¶¶ 43, 45, 48.) These facts, interpreted in the light most favorable to Plaintiff, are sufficient to meet Plaintiff's burden at this stage, and the Court finds it sufficient to plausibly allege that Capra was personally involved in Plaintiff's transfer. *See Barzee v. Abdulla*, No. 23-CV-2328, 2024 WL 4836870, at *9 (S.D.N.Y. Nov. 20, 2024) (holding that personal involvement could be reasonably inferred based on the allegations, which did not specifically allege which of the defendants had ordered the plaintiff's transfer); *Tolliver v. Jordan*, No. 19-CV-11823, 2021 WL 2741728, at *7 (S.D.N.Y. July 1, 2021) (concluding allegations that defendants threatened to have the plaintiff "'packed up and shipped' to a facility far away from his family if he did not withdraw his grievances and lawsuits" were sufficient, on their own, to meet the personal involvement requirement); *Smith v. City of New York*, No. 03-CV-7576, 2005 WL 1026551, at *5 (S.D.N.Y. May 3, 2005) (holding, on a motion for summary judgement, that the plaintiff had established defendant's personal involvement through defendant's statements threatening to transfer plaintiff, as well as additional circumstantial evidence).

   Plaintiff's allegations against Alam are much thinner; nevertheless, they are sufficient to satisfy Plaintiff's burden at this stage. Plaintiff alleges that he was transferred based on a pretextual assertion of medical need, (*see* AC ¶ 14), and that Alam was the primary physician assigned to him, (*see* AC ¶ 20). He alleges that Alam had discussed his status as a "problem" with Capra. (*See* Pl. Mem. 11.) He also alleges that Alam issued the "medical needs transfer order" that ultimately resulted in his transfer out of Sing Sing. (*See id*.) While these allegations

may not be definitive proof of Alam's personal participation in Plaintiff's transfer, they are

sufficient, at this stage to plausibly plead the personal participation. *See Washington v. City of*

*New York*, No. 18-CV-12306, 2019 WL 2120524, at *22 (S.D.N.Y. Apr. 30, 2019) (holding the

plaintiff alleged sufficient personal involvement where the defendants applied for and obtained

the order resulting in the plaintiff's transfer); *McGriff v. Keyser*, No. 17-CV-7307, 2019 WL

6033421, at *9 (S.D.N.Y. Nov. 13, 2019) (finding the defendant was personally involved in the

alleged constitutional violation where, inter alia, he authored a misconduct report that led to the

violation).[6]

---

[6] To be held liable pursuant to Section 1983, the Second Circuit also requires that
defendants act with knowledge of the facts that render their acts unlawful. *Provost v. City of
Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001) ("Thus, what we have meant by using phrases such
as 'direct participation' as a basis of liability is personal participation by one who has knowledge
of the facts that rendered the conduct illegal."); *see also Dempsey v. City of Rochester*, No. 19-
CV-6780, 2025 WL 19969, at *12 (W.D.N.Y. Jan. 2, 2025) (same); *McClarin v. City of New
York*, No. 16-CV-6846, 2020 WL 3183893, at *4 (E.D.N.Y. June 15, 2020) (same).
    Plaintiff alleges that Alam falsely stated that Plaintiff had a medical condition which
resulted in his transfer, when the allegations plainly demonstrate that Alam either did not believe
that to be true, (*see* AC ¶¶ 21–25 (alleging that Alam refused to grant Plaintiff a "flat[s] pass")),
or had done insufficient investigation to determine whether that was true, (*see id*. ¶ 27 (alleging
that Plaintiff never returned to Alam for treatment of his back and Alam refused to assess
Plaintiff's condition)).
    These allegations are sufficient to permit the Court to plausibly infer that Alam issued the
medical transfer order with knowledge of the facts that rendered his actions unlawful—namely,
that Plaintiff did not need a flats pass and the issuance of such an order was merely pretextual.
*Cf. Haughey v. County of Putnam*, No. 18-CV-2861, 2020 WL 1503513, at *6 (S.D.N.Y. Mar.
29, 2020) (holding there were sufficient allegations "to raise a plausible inference" of knowledge
where the defendant variously failed to take basic steps to ensure the validity of his report); *Ying
Li v. City of New York*, 246 F. Supp. 3d 578, 623–24 (E.D.N.Y. 2017) (finding that a plaintiff's
allegation that defendant officials hid the "absence of any medical support for the charge that
[the plaintiff] caused [the victim's] death" was plausible based on allegations suggesting that
defendants' conclusions were "entirely unsupportable by any medical science" (record citations,
emphases, alteration, and quotation marks omitted)).

3.  Conspiracy Under 42 U.S.C. § 1983[7]

    a.  Intra-Corporate Conspiracy Doctrine

Defendants also assert that Plaintiff's conspiracy claim is barred by the intracorporate conspiracy doctrine.  (*See* Defs. Rep. 9.)  "[The intracorporate conspiracy] doctrine 'provides that a corporation or public entity generally cannot conspire with its employees or agents as all are considered a single entity.'"  *King v. City of New York*, 581 F. Supp. 3d 559, 577 (S.D.N.Y. 2022) (quoting *Everson v. N.Y.C. Transit Auth.*, 216 F. Supp. 2d 71, 76 (E.D.N.Y. 2002)), *aff'd*, No. 22-231, 2023 WL 2398679 (2d Cir. Mar. 8, 2023).  "The Second Circuit has held that the intra-corporate conspiracy doctrine applies to § 1985 claims, and district courts within this Circuit have routinely applied the doctrine to § 1983 claims."  *Id.* (citing *Herrmann v. Moore*, 576 F.2d 453, 459 (2d Cir. 1978) and *Chamberlain v. City of White Plains*, 986 F. Supp. 2d 363, 388 (S.D.N.Y. 2013)); *see also Quirk v. DiFiore*, 582 F. Supp. 3d 109, 115 (S.D.N.Y. 2022) (dismissing conspiracy claim against named defendants—all members of the same state entity— pursuant to the intracorporate conspiracy doctrine).  Here, Alam and Capra were all employees of Sing Sing—"a single corporate entity."  *Cowan v. City of Mount Vernon*, 95 F. Supp. 3d 624, 650 (S.D.N.Y. 2015).  Therefore, the intercorporate conspiracy doctrine applies.

---

[7]  Defendants argue that Plaintiff may not amend his AC via his Opposition to add new claims or theories.  (See Defs. Rep. 8–9.)  Defendants' arguments are unavailing, as the Court is required to "construe[ the complaint] to raise the strongest arguments it suggests," *Gress v. DeJoy*, No. 21-CV-1066, 2024 WL 1072730, at *1 n.1 (D. Conn. Mar. 12, 2024) (citing *McCray v. Lee*, 963 F.3d 110, 116–17 (2d Cir. 2020)), even where doing so raises claims that are not explicitly referenced, *see Taylor v. Quayyum*, No. 16-CV-1143, 2021 WL 6065743, at *8 (S.D.N.Y. Dec. 21, 2021) (citing *McLeod v. Jewish Guild for the Blind*, 864 F.3d 154, 157 (2d Cir. 2017)).  Here, the Court finds the allegations sufficient to state a claim for conspiracy under Section 1983, and therefore construes the AC to raise such a claim.

"[A]n exception to the intracorporate conspiracy doctrine applies to individuals within a single entity when they are pursuing personal interests wholly separate and apart from the entity.'" *Hartline v. Gallo*, No. 03-CV-1974, 2006 WL 2850609, at *9 (E.D.N.Y. Sept. 30, 2006) (citation, quotation marks, and alteration omitted), *aff'd in relevant part*, 546 F.3d 95 (2d Cir. 2008). "'Some examples of a personal stake include infringing a plaintiff's rights to cover up a prior use of excessive force, engaging in race-based false arrests to boost arrest numbers in pursuit of a promotion, or acting out of pure malice.'" *Cooper v. Clancy*, No. 19-CV-362, 2023 WL 7281149, at *9 (N.D.N.Y. Nov. 3, 2023) (quoting *Johnston v. City of Syracuse*, No. 20-CV-1497, 2021 WL 3930703, at *9 (N.D.N.Y. Sept. 2, 2021)). Here, the AC raises a plausible inference that Capra and Alam had motivations "wholly separate and apart" from their motivations to protect the entity of which they were a part. (*See generally* AC; Pl. Mem.)

It is true that some of the allegations made by Plaintiff clearly suggest that Capra reacted to Plaintiff's grievances about Sing Sing's *policies*, rather than himself. Specifically, Plaintiff alleges Capra became enraged when Plaintiff complained about Sing Sing's COVID-19 and related capacity policies. (*See* AC ¶ 32). To the extent Plaintiff alleges Capra and Alam conspired to retaliate against him for those grievances, his claims are likely to be barred by the intracorporate conspiracy doctrine, because such retaliation would be in defense of the prison's policy, rather than Capra or Alam themselves. *Cf. Dilworth v. Goldberg*, 914 F. Supp. 2d 433, 466–67 (S.D.N.Y. 2012) (finding the plaintiff failed to state claim that could overcome the intracorporate conspiracy doctrine where he alleged the defendants harassed him into dropping charges against their employer).

Other allegations are a closer call. For example, to the extent the alleged conspiracy was aimed at retaliating against Plaintiff for complaining about the physical and verbal abuse by

18

prison staff, (*see* AC ¶¶ 33), it is plausible that this conduct would not be protected by the intracorporate conspiracy doctrine, because courts have held that efforts to protect other prison employees from the consequences of unlawful or harassing behavior fall into the personal interest exception, *see, e.g.*, *Johnston*, 2021 WL 3930703, at *9–10 (finding the personal interest exception applies where defendant conspired to cover up their use of excessive force against the plaintiff)*; Ali v. Connick*, 136 F. Supp. 3d 270, 283 (E.D.N.Y. 2015) (same); *Medina v. Hunt*, No. 05-CV-1460, 2008 WL 4426748, at *8–9 (N.D.N.Y. Sept. 25, 2008) (finding the personal interest exception applied where incarcerated plaintiff alleged that defendant guards conspired to assault him in retaliation for his participation in a federal lawsuit).

Furthermore, to the extent that the alleged conspiracy was aimed at retaliating against Plaintiff for humiliating Capra and Alam in front of external groups, (*see* AC ¶ 23, 36–38), it may in fact fall into the personal interest exception, *see Clark*, 2023 WL 5349149, at *12 (denying defendant's motion to dismiss on intracorporate conspiracy grounds where the factual allegations suggested that "[the d]efendants could plausibly have retaliated against [the plaintiff] for [his public testimony] because [the plaintiff] criticized and shamed [one defendant] in a very public setting before [another defendant's] legislative overseers").

In sum, the determination is a complicated one, but some allegations suggest Defendants had a personal stake in the unconstitutional retaliation, and therefore, at this stage, the Court determines the intracorporate conspiracy doctrine does not bar Plaintiff's conspiracy claim.  *See Oliver v. N.Y. State Police*, No. 15-CV-444, 2017 WL 11509465, at *15 (N.D.N.Y. Mar. 24, 2017) (denying motion to dismiss a Section 1983 conspiracy claim where the plaintiff plausibly alleged that the defendants acted in their own personal interest); *Anand v. N.Y. State Dep't of Tax'n & Fin.*, No. 10-CV-5142, 2012 WL 2357720, at *10 n.8 (E.D.N.Y. June 18, 2012)

(denying the motion to dismiss plaintiff's conspiracy claim because "[o]n the basis of the current pleadings, the Court cannot determine whether the intracorporate conspiracy doctrine would bar plaintiff's claim").

b. Substantive Conspiracy Analysis

"A conspiracy claim under Section 1983 requires (1) an agreement between two or more state actors to inflict an unconstitutional injury on a plaintiff and (2) an overt act committed in furtherance of that goal." *See Balentine v. Doe*, No. 21-CV-1383, 2022 WL 17818553, at *7 (N.D.N.Y. Dec. 20, 2022) (citing *Ciambriello v. County of Nassau*, 292 F.3d 307, 324–25 (2d Cir. 2002)); *see also McCrae v. Town of Brookhaven*, --- F. Supp. 3d ----, 2024 WL 5120016, at *14 (E.D.N.Y. Dec. 16, 2024) (same). Courts have recognized a conspiracy "can be alleged with only 'circumstantial evidence,'" *McCrae*, 2024 WL 5120016, at *15 (quoting *Puglisi v. Underhill Park Taxpayer Ass'n*, 947 F. Supp. 673, 706 (S.D.N.Y. 1996)), because "conspiracies have long been recognized to be secretive by nature," *Johnson v. City of New York*, No. 22-CV-3320, 2023 WL 11868258, at *11 (E.D.N.Y. Sept. 15, 2023).

Although Plaintiff does not provide allegations of direct evidence of conspiracy, the AC alleges circumstantial evidence plausibly suggesting that Capra and Alam entered into an agreement to effect Plaintiff's transfer from Sing Sing. Plaintiff alleges that Alam told Plaintiff he did not "take lightly to Plaintiff's family making [a] complaint [to outside actors about Alam's refusal to issue a flats pass]" and, as a result of Plaintiff's complaints, he would "address the matter with [] Capra." (*See* AC ¶ 24.) Later, Capra referenced Plaintiff's disagreement with Alam, (*see* AC ¶ 38), strong circumstantial evidence that Defendants met to discuss Plaintiff's complaints.

Furthermore, as discussed above, the AC plausibly alleges that Plaintiff's transfer was in retaliation for his criticisms of both Capra and Alam, (*see supra* II.B.2.), and effected through a pretextual assertion of medical need—one that Alam was likely been involved in, as he was Plaintiff's primary physician at the time, (*see* AC ¶¶ 20–21.)

In combination, the evidence that Capra and Alam shared displeasure about Plaintiff's complaints, that they met to discuss Plaintiff's behavior, and that Capra would likely have had to coordinate with Alam to have Plaintiff transferred on the basis of pre-textual "medical need" is sufficient to suggest that the Defendants agreed, expressly or tacitly, to have Plaintiff removed from Sing Sing in retaliation for his speech. *See Kellner v. City of New York*, No. 17-CV-1268, 2021 WL 4251343, at *14 (E.D.N.Y. Sept. 17, 2021) (concluding that the plaintiff had adequately alleged circumstantial evidence of a conspiracy where he had demonstrated a shared interest between the defendants and evidence of coordination among them); *cf. Ying Li*, 246 F. Supp. 3d at 621 ("drawing all reasonable inferences in [] favor" of the plaintiff and declining to dismiss her Section 1983 conspiracy claim despite the fact that "[p]laintiff's pleading of her conspiracy claim is hardly robust").

The allegations also plead overt acts done in furtherance of the conspiracy: Plaintiff alleges that Alam the "medical needs transfer order" that ultimately resulted in his transfer out of Sing Sing, (*see* Pl. Mem. 11), that Capra ordered his transfer, (Pl. Mem. 10). These allegations adequately support Plaintiff's claim of conspiracy. *See Reeves v. New York*, No. 21-CV-659, 2022 WL 1963637, at *5 (N.D.N.Y. June 6, 2022) (indicating that "filing false documents" satisfied the overt act requirement of a Section 1983 conspiracy claim).

\* \* \*

In sum, Plaintiff plausibly alleges a conspiracy pursuant to Section 1983, and that his claim is not subject to the intracorporate conspiracy doctrine.

4. <u>Qualified Immunity</u>

Defendants argue that they should be entitled to qualified immunity. (*See* Defs. Mem. 18; Defs. Rep. 9–10.) Defendants concede that it is axiomatic in the Second Circuit that retaliation against an incarcerated individual for exercising his First Amendment rights is not shielded by qualified immunity, (*see* Defs. Rep. 9–10), but they nevertheless argue that applying this case law to the situation at bar would be "analyzing the issue at too high a level of generality," (*see id.*), because "[i]t would not have been clear to officials in the Defendants' positions here that their alleged actions were unlawful," (*see id*).

The Court disagrees. Courts in the Second Circuit have repeatedly found that transferring a prisoner to another prison because they participated in a grievance process implicates a right which is clearly established. *See Arriaga*, 2024 WL 1743300, at *13 ("Retaliatory transfer has been clearly illegal for decades." (internal citation and quotation marks omitted)); *Sanchez v. Ziolkowski*, No. 13-CV-6657, 2019 WL 2250016, at *2 (W.D.N.Y. May 24, 2019) ("[T]he Second Circuit has determined that inmates do have a clearly established right to be free from retaliation for filing a grievance."); *Lowrance v. Coughlin*, 862 F. Supp. 1090, 1098 (S.D.N.Y. 1994) ("The Second Circuit [] stated that 'retaliatory transfers were clearly illegal in 1980.'" (alteration adopted) (quoting *Meriwether v. Coughlin*, 879 F.2d 1037, 1046 (2d Cir.1989))).[8]

---

[8] In fact, at least one court in this Circuit has denied a qualified immunity claim on nearly *identical* factual claims. In *Arriaga*, Capra was accused of initiating a retaliatory transfer against a plaintiff who had, inter alia, made a grievance about unprofessional behavior by prison officials as a member of the ILC. *See Arriaga*, 2024 WL 1743300, at *13. In that case, the court found that Capra violated a constitutional right that had been "clearly established" "for decades" and could not invoke qualified immunity. *See id*.

For these reasons, Defendants' qualified immunity claims are denied.

     5.  <u>Injunctive Relief</u>

Defendants argue that Plaintiff's claims for injunctive relief must be dismissed because Defendants do not have the power to effect his transfer back to Sing Sing or to any other prison. (*See* Def. Mem. 20–21.)  The Court agrees.

State officials may be subject to suit in their official capacities for injunctive or other prospective relief.  *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 n.10 (1989) ("[O]fficial-capacity actions for prospective relief are not treated as actions against the State."). "Nonetheless, a prisoner's transfer from a correctional facility generally moots claims for declaratory and injunctive relief against officials of that facility."  *Arriaga*, 2024 WL 1743300, at *14 (citing *Booker v. Graham*, 974 F.3d 101, 107 (2d Cir. 2020)); *Walker v. City of New York*, 367 F. Supp. 3d 39, 51 (S.D.N.Y. 2019) (same) (quoting *Prins v. Coughlin*, 76 F.3d 504, 506 (2d Cir. 1996)); *see also Breton v. Lamont*, No. 21-CV-719, 2021 WL 3726011, at *8 (D. Conn. Aug. 23, 2021) (same) (quoting *Gray v. Licon-Vitale*, No. 19-CV-1291, 2021 WL 124320, at *1 (D. Conn. Jan. 13, 2021) (citing *Shepherd v. Goord*, 662 F.3d 603, 610 (2d Cir. 2011))).

    Here, Plaintiff requests an injunction against Capra and Alam, ordering them to transfer him back to Sing Sing, or else a prison closer to his family.  However, as noted above, the Court cannot issue an injunction against the officials of a facility Plaintiff was removed from.  *See, e.g., Tolliver*, 2021 WL 2741728, at *4 (denying as moot the plaintiff's claims for injunctive relief against prison officials in the prison he was transferred away from).  Further, "there is no legal basis for this Court to order that plaintiff be housed at a particular facility."  *Lasher v. Dagostino*, No. 16-CV-198, 2016 WL 1717205, at *8 n.12 (N.D.N.Y. Apr. 28, 2016); *see also Muhammad v. Hodge*, No. 07-CV-232, 2010 WL 1186330, at *7 (W.D.N.Y. Mar. 24, 2010) (holding, in

response to a plaintiff's request to be transferred from Attica Correctional Facility that "[the] [c]ourt lack[ed] the authority to order that the defendant be imprisoned in any particular facility").

For this reason, Plaintiff's claims for injunctive relief are dismissed.

III.    Conclusion

For the reasons discussed above, Defendants' Motion is granted in part, and denied in part.

If Plaintiff wishes to file a second amended complaint alleging additional facts and otherwise addressing the deficiencies identified above, Plaintiffs must do so within 30 days of the date of this Opinion & Order. Plaintiff is further advised that the second amended complaint will completely replace, not supplement, the Amended Complaint. The second amended complaint must therefore contain all of the claims, defendants, and factual allegations that Plaintiff wishes the Court to consider.

The Clerk of Court is respectfully directed to terminate the pending motion, (Dkt. No. 41), and mail a copy of this Opinion to Plaintiff. The Court will hold a status conference on May 13, 2025 at 11:30 A.M.

SO ORDERED.

Dated:    March 28, 2025
          White Plains, New York

_____
KENNETH M. KARAS
United States District Judge

24